# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | |
|---|---|
| PATSY J. WISE, REGIS CLIFFORD, CAMILLE ANNETTE BAMBINI, SAMUEL GRAYSON BAUM, DONALD J. TRUMP FOR PRESIDENT INC., U.S. CONGRESSMAN DANIEL BISHOP, U.S. CONGRESSMAN GREGORY F. MURPHY, REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, and NORTH CAROLINA REPUBLICAN PARTY,<br><br>*Plaintiffs, vs.*<br><br>THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; STELLA ANDERSON, in her official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS,<br><br>*Defendants.* | Civil Action No. 5:20-cv-505 |

## COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Patsy J. Wise, Regis Clifford, Camille Annette Bambini, Samuel Grayson Baum, the Donald J. Trump for President, Inc. ("DJT Committee"), U.S. Congressman Daniel Bishop, U.S. Congressman Gregory F. Murphy, Republican National Committee ("RNC"), National Republican Senatorial Committee ("NRSC"), National Republican Congressional Committee ("NRCC"), and the North Carolina Republican Party ("NCRP") bring this action for preliminary

and permanent declaratory and injunctive relief against Defendants the North Carolina State Board of Elections; Damon Circosta, in his official capacity as Chair of the State Board of Elections; Stella Anderson, in her official capacity as Secretary of the State Board of Elections; and Jeff Carmon III in his official capacity as a Member of the State Board of Elections; and Karen Brinson Bell, in her official capacity as Executive Director of the State Board of Elections. Plaintiffs allege as follows:

## BACKGROUND

1.    This is an action to vindicate properly enacted election laws and procedures against an improper and ultra vires backroom deal publicly announced earlier this week. The deal, in the form of a purported "Consent Judgment," is between Defendants and a partisan group that, with its allies, has been announcing similar deals around the county. The intent and effect of the deal is to undermine the North Carolina General Assembly's carefully-considered, balanced structure of election laws. While touted as allowing greater access to voters during the current pandemic—an objective already addressed in recent months by the General Assembly—the actual effect is to undermine protections that help ensure the upcoming election will be not only safe and accessible but secure, fair, and credible.

2.    The Elections Clause of the Constitution of the United States directs that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives *shall* be prescribed in each State by the Legislature thereof." Art. I, sec. 4. Likewise, the Electors Clause of the Constitution directs that "[e]ach State shall appoint, in Such Manner as the Legislature thereof may direct, a Number of [Presidential] electors." Art. II, sec. 1. The North Carolina General Assembly has fulfilled these solemn responsibilities by enacting, and updating as needed, a balanced, comprehensive election code.

2

3.     Indeed, just three months ago, in response to the current pandemic, the General Assembly made several important revisions to the election code by passing House Bill 1169 ("HB 1169"). These revisions struck a careful balance between making voting accessible and safe for all qualified voters while ensuring the integrity of the election process with safeguards against irregularities, including fraud. This balance is a delicate one: if standards for voting are too strict, eligible voters may be unable to vote, but if standards are too lax, election outcomes can be compromised and confidence in the process eroded. The General Assembly understands that the people of North Carolina trust and expect their legislators to strike this balance, which is essential to sustain public confidence and participation in the democratic process.

4.     Concern about election security and integrity, especially with regard to absentee ballots, is well-founded. According to the Commission on Federal Election Reform—a bipartisan commission chaired by former President Jimmy Carter and Secretary of State James A. Baker III, and cited extensively by the U.S. Supreme Court—absentee voting is "the largest source of potential voter fraud." Building Confidence in U.S. Elections 46, https://bit.ly/3dXH7rU (the "Carter-Baker Report").

5.     The General Assembly is all too familiar with the threat and actuality of absentee ballot fraud in elections. In the 2018 congressional election in North Carolina's Ninth Congressional District, political operative L. McCrae Dowless directed an illegal scheme in which he and others undermined the results of the election by manipulating absentee ballots.[1] The State Board of Elections was forced to order a new vote because the "the corruption, the absolute mess

---

[1] Alan Blinder, *Election Fraud in North Carolina Leads to New Charges for Republican Operative*, N.Y. TIMES (July 30, 2019), https://www.nytimes.com/2019/07/30/us/mccrae-dowless-indictment.html.

with the absentee ballots" irreparably tainted the election.[2]  Perhaps most troubling, the scheme

occurred undetected through the 2016 general election and was uncovered only after the 2018

primary election.  As one of the prosecutors working on the case explained, "[w]hat has been

challenging about this case and this investigation is that, as has been widely reported, *certain*

*activity has gone on for years*."[3]

6.     The Dowless scheme was, unfortunately, not unique.  Voter fraud is a legitimate

threat to free and fair elections.  Examples of such fraud are widespread, and they have extended

over several years.  From 2018 to 2020, there were at least 15 instances of fraudulent use of

absentee ballots discovered throughout the country, including in Virginia, Florida, and Arizona.

7.     In a comprehensive article on absentee ballot fraud, the New York Times confirmed

that "votes cast by mail are . . . more likely to be compromised and more likely to be contested

than those cast in a voting booth, statistics show."[4]  Absentee ballots pose a number of issues that

create the potential for fraud, issues that are particularly clear with respect to elderly voters.  One

practice involves people affiliated with campaigns "helping" senior citizens in nursing homes, who

can be "subjected to subtle pressure, outright intimidation or fraud," while "their ballots can be

intercepted both coming and going."[5] As a result of these and other weaknesses in absentee ballots,

fraud in voting by mail is "vastly more prevalent than in-person voting."[6]  For instance, "[i]n

Florida, absentee-ballot scandals seem to arrive like clockwork around election time," and mayoral

elections in Illinois and Indiana and have been invalidated because of "fraudulent absentee

---

[2] *Id.*

[3] *Id.* (emphasis added).

[4] Adam Liptak, *Error and Fraud at Issue as Absentee Voting Rises*, N.Y. TIMES (Oct. 6, 2012).

[5] *Id.*

[6] *Id.*

4

ballots."[7] According to a Yale law professor, the comparative ease of absentee ballot fraud explains why "*all the evidence of stolen elections* involves *absentee ballots* and the like."[8] Indeed, "[v]oting by mail is now common enough and problematic enough that election experts say there have been *multiple elections* in which no one can say with confidence which candidate was the deserved winner."[9]

8.    More recent examples abound. A New Jersey state court found that a local election held this year was "rife with mail in vote procedure violations." The results of that election were set aside and the election is being rerun.[10] In August, a California man "pleaded guilty of casting fraudulent mail-in ballots on behalf of his dead mother in three different elections."[11] And just this week, federal authorities began investigating the mishandling of absentee ballots in Pennsylvania, where local officials discovered that nine valid ballots were discarded (seven of which were votes for President Trump).[12]

9.    Courts have repeatedly cautioned that absentee ballots are uniquely susceptible to fraud. As Justice Stevens has noted, "flagrant examples of [voter] fraud ... have been documented throughout this Nation's history by respected historians and journalists," and "the risk of voter fraud" is "real" and "could affect the outcome of a close election." *Crawford*, 553 U.S. at 195-196 (plurality op. of Stevens, J.) (collecting examples). Similarly, Justice Souter observed that mail-

---

[7] *Id.*

[8] *Id.* (emphasis added).

[9] *Id.* (emphasis added).

[10] https://www.wsj.com/a-mail-in-voting-redo-in-new-jersey-11598050780 (last accessed Aug. 24, 2020).

[11] Sophie Mann, *California Man Pleads Guilty to Mail-In Ballot Fraud After Voting for Dead Mother in Three Elections* (Aug. 19, 2020), available at https://justthenews.com/politics-policy/elections/california-man-charged-mail-ballot-fraud-after-voting-his-dead-mother#article.

Case 1:20-cv-00912-WO-JLW   Document 1   Filed 09/26/20   Page 5 of 34

in voting is "less reliable" than in-person voting. *Crawford*, 553 U.S. at 212, n.4 (Souter, J., dissenting) ("'election officials routinely reject absentee ballots on suspicion of forgery'"); *id*. at 225 ("absentee-ballot fraud … is a documented problem in Indiana").

10.    With a surge in absentee voting expected in the upcoming November 2020 election-- the website for the North Carolina Board of Elections reports, as of September 24, 2020, that 1,028,648 persons had already requested an absentee ballot[13]—prudent legislators and election administrators understand the fertile opportunities for fraud.  Accordingly, the General Assembly struck a proper balance between accessibility and security.

11.    Notwithstanding the General Assembly's thoughtful and responsible action, the State Board of Elections undid this careful balance by publicly announcing an illegitimate backroom deal that would undermine the protections against fraud.  Not only is this bad—indeed terrible—policy, it also usurps the power vested with the North Carolina General Assembly by the Constitution of the United States.

12.    The Board's actions cannot stand and, through this Complaint, Plaintiffs urge the Court to enjoin them.

## NATURE OF THE ACTION

13.    The U.S. Constitution entrusts state legislatures to set the time, place, and manner of elections and to determine how the state chooses electors for the presidency.  *See* U.S. Const. art. I, §4 and art. II, §1.

---

[13] *See* https://www.ncsbe.gov/.

14. In June, the North Carolina General Assembly enacted House Bill 1169 ("HB 1169")[14] to prepare for the administration of the upcoming election amid the ongoing COVID-19 pandemic. The law is intended to protect the safety of voters, ease some ballot procedures to ensure that vulnerable individuals are able to vote without undue risks to their health, and ensure the integrity of votes cast in the election—especially by absentee ballot.

15. Although the General Assembly passed the HB 1169 by overwhelming bipartisan majorities, and although the North Carolina Board of Elections vigorously and successfully defended those statutes in two court cases (one in in the U.S. District Court for the Middle District of North Carolina and the other in Wake County Superior Court), the Board recently, and abruptly, announced a secretly-negotiated "Consent Order" (the "deal") that, as detailed below, directly contradicts North Carolina law and usurps the General Assembly's authority.

16. Moreover, and importantly, the purported "Consent Order" is a component of a nation-wide strategy formulated by lawyers for the Democratic Party Committees. That strategy is inaptly-named "Democracy Docket." On its website, the organizers of the "Democracy Docket" boast involvement in over 56 lawsuits in 22 states around the country by Democratic Party committees and their allies to rewrite election laws in the state and federal courts. Marc Elias, "Committed to Justice," On the Docket Newsletter (Sept. 2020), https://www.democracydocket.com/category/otd/. But rather than litigating those cases to conclusion—because they might and most often do lose on their challenges, as they have in North Carolina—the emerging strategy is to cut backroom deals with friendly state election officials to eviscerate statutory protections against fraud, sow confusion among the electorate and election

---

[14] *See* An Act to Make Various Changes to the Laws Related to Elections and to Appropriate Funds to the State Board of Elections in Response to the Coronavirus Pandemic, S.L. 2020-17 (June 15, 2020).

officials, and extend the November 2020 election to mid-November or beyond. Already, this strategy has played out in purported "consent decrees" with complaisant election officials in Virginia,[15] Rhode Island,[16] Minnesota,[17] Arizona,[18] and Georgia.[19] It is now plain that this effort to take the responsibility for election laws from the state legislatures, where it is vested by Article I, section 4 of the Constitution, and place it in the courts, is actually an "anti-Democracy project" to thwart the will of the people and undermine the integrity of the 2020 election.

17.     Second, on the same day as the Consent Judgment, the Board issued several policy memoranda related to absentee voting procedures that eviscerated anti-fraud measures enacted by the General Assembly.  On information and belief, these memoranda are part and parcel of the illegitimate deal described above.

18.     These abrupt changes only six weeks before the November election were not authorized by state law and usurp the General Assembly's authority to regulate the "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives" under the U.S. Constitution.  Accordingly, the voting procedures are invalid and must be enjoined.

19.     The new system adopted by the Board of Elections will violate eligible citizens' right to vote by, among other things, allowing absentee ballots to be cast late and without proper witness verification, which invites fraud, coercion, theft, and otherwise illegitimate voting.

---

[15] *League of Women Voters of Va. v. Va. State Bd.*, No. 6:20-cv-00024, Dkt. Nos. 110 (W.D. Va. Aug. 21, 2020).

[16] *Common Cause R.I. v. Gorbea*, 20-cv-00318-MSM-LDA, 2020 WL 4365608 (D. RI July 30, 2020).

[17] *LaRose v. Simon*, No. 62-CV-20-3149, Consent Decree (Ramsey Cty. Dist. Ct. July 17, 2020).

[18] *Voto Latino Found. v. Hobbs*, No. 2:19-cv-05685-DWL, Settlement Agreement, Dkt. 57-1 (D. Az. June 18, 2020).

[19] *Democracy Party of Georgia, et al. v. Raffensperger, et al.*, No. 1:19-cv-05028-WMR, Compromise Settlement Agreement, Dkt. 56-1 (D. Ga. Mar. 6, 2020).

Case 1:20-cv-00912-WO-JLW   Document 1   Filed 09/26/20   Page 8 of 34

20.     Fraudulent and invalid votes dilute the votes of honest citizens and deprive them of their rights under the Fourteenth Amendment. Just as important, failure to ensure election integrity by adopting insufficient safeguards against fraud erodes public confidence and suppresses participation in the election process.

21.     For all the reasons detailed in this Complaint, the actions by the Board of Elections are illegal and must be enjoined.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under the U.S. Constitution and the laws of the United States, and because Plaintiffs seek equitable and other relief for the deprivation of constitutional and federal statutory rights under color of state law.

23.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

24.     Venue is appropriate in the Eastern District of North Carolina, under 28 U.S.C. § 1391(b)(1), because defendants are located in this District and many of the acts at issue occurred in this District.

## PARTIES

25.     Patsy J. Wise is a registered voter in Sampson County, North Carolina, and has already cast her absentee ballot for the November 3, 2020 election, and mailed it in, all in accordance with statutes, including the Witness Requirement, enacted by the General Assembly. Ms. Wise was shocked to learn of the actions taken by the Board of Elections as described in this Complaint, and has a serious concern that her vote will be negated by improperly cast or fraudulent ballots.

26.     Regis Clifford is a registered voter in Mecklenburg County, North Carolina, and intends to vote in the November 3, 2020 election. Mr. Clifford was also shocked to learn of the actions taken by the Board of Elections as described in this Complaint, and has a serious concern that his vote will be negated by improperly cast or fraudulent ballots.

27.     Camille Annette Bambini is a registered voter in Mecklenburg County, North Carolina, and intends to vote in the November 3, 2020 election. Ms. Bambini was shocked to learn of the actions taken by the Board of Elections as described in this Complaint, and has a serious concern that her vote will be negated by improperly cast or fraudulent ballots

28.     Samuel Grayson Baum is a registered voter in Forsyth County, North Carolina, and intends to vote in the November 3, 2020 election. Mr. Baum was shocked to learn of the actions taken by the Board of Elections as described in this Complaint, and has a serious concern that his vote will be negated by improperly cast or fraudulent ballots.

29.     Plaintiff Donald J. Trump for President, Inc. is the principal committee for President Donald J. Trump's reelection campaign. The DJT Committee is registered as a candidate committee with the Federal Election Commission pursuant to 52 U.S.C. § 30101(5) and 11 C.F.R. § 102.1. Its headquarters are located at 725 Fifth Avenue, 15th Floor, New York City, NY 10022.

30.     The DJT Committee spends resources, including hiring campaign staff in North Carolina to encourage North Carolinians to reelect the President. It also spends significant sums of money in the state to further those interests. Changes to North Carolina election procedures require the committee to change how it allocates its resources, and the time and efforts of its campaign staff, to achieve its electoral and political goals. The DJT Committee believes the improper and ultra vires actions of the Board of Elections to change the rules governing the 2020

election threaten the integrity and fairness of the election process, and directly threaten the President's prospects for reelection.

31.     James Daniel Bishop is a Republican Member of the United States House of Representatives representing the citizens of the Ninth Congressional District of North Carolina. Congressman Bishop will appear on the ballot as candidate for re-election in the November 3, 2020 general election.

32.     Gregory F. Murphy is a Republican Member of the United States House of Representatives representing the citizens of the Third Congressional District of North Carolina. Congressman Murphy will appear on the ballot a candidate for re-election in the November 3, 2020 general election.

33.     The RNC is a national political party with its principal place of business at 310 First Street S.E., Washington D.C., 20003. It is registered as a national political party committee with the Federal Election Commission pursuant to 52 U.S.C. § 30101(14).

34.     The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It also comprises 168 voting members representing state Republican Party organizations, including members in North Carolina.

35.     The RNC organizes and operates the Republican National Convention, which nominates a candidate for President and Vice President of the United States.

36.     The RNC works to elect Republican candidates to state and federal office. In November 2020, its candidates will appear on the ballot in North Carolina for local, state, and federal offices.

37.     The RNC has a vital interest in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in North Carolina elections and elsewhere.

11

The RNC brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its affiliated voters and candidates.

38.     The RNC also has an interest in preventing abrupt and unlawful changes to North Carolina election laws because they can confuse voters, undermine confidence in the electoral process, and create an incentive to remain away from the polls. Such changes to North Carolina voting procedures require the RNC to divert resources and spend significant amounts of resources educating voters on those changes and encouraging them to vote regardless of the changes.

39.     Plaintiff NRSC is a national political party committee with its principal place of business at 425 2nd St NE, Washington, D.C. 20002. It is registered as a national political party committee with the Federal Election Commission pursuant to 52 U.S.C. § 30101(14). Its leadership is elected by the sitting Republican members of the United States Senate, including Senator Thom Tillis, who will be on the ballot for reelection in North Carolina on November 3, 2020.

40.     The NRSC is the only national political party committee exclusively devoted to electing Republican candidates to the U.S. Senate, and it spends significant resources in North Carolina on this mission. The committee will devote resources to inform voters of election procedures and to monitor the results of the Senatorial election in North Carolina. Changes to North Carolina voting procedures require the committee to change how it allocates its resources, and the time and efforts of its staff, to achieve its electoral and political goals.

41.     Plaintiff NRCC is the national organization of the Republican Party dedicated to electing Republicans to the U.S. House of Representatives. It is registered as a national political party committee with the Federal Election Commission pursuant to 52 U.S.C. § 30101(14). Its membership comprises the sitting Republican members of the United States House of

Case 1:20-cv-00912-WO-JLW   Document 1   Filed 09/26/20   Page 12 of 34

Representatives, including 9 Members from North Carolina, several of whom will be on the ballot for reelection on November 3, 2020.

42. A critical part of the NRCC's mission is to support Republican candidates for the U.S. House of Representatives in elections throughout the country, including in North Carolina.

43. In the 2020 election, the NRCC will be supporting candidates for Congress. For this reason, the NRCC has a strong interest in protecting the integrity, fairness, and security of election procedures throughout the United States, including in North Carolina, and in ensuring that properly enacted statutes are respected, enforced, and followed.

44. Plaintiff NCRP is a North Carolina state political party organization recognized under state and federal law. *See* 11 C.F.R. 100.15; N.C. Gen. Stat. § 163-96.

45. A fundamental focus of the NCRP's mission is to support Republican candidates running in North Carolina elections. In the 2020 election, the NRCP will be supporting a full slate of candidates for elected office in the State of North Carolina.

46. Defendant North Carolina State Board of Elections is the agency responsible for the administration of the election laws of the State of North Carolina.

47. Defendant Damon Circosta is the Chair of the North Carolina State Board of Elections. Mr. Circosta is sued in his official capacity.

48. Defendant Stella Anderson is a Member and the Secretary of the North Carolina State Board of Elections. Ms. Anderson is sued in her official capacity.

49. Defendant Jeff Carmon III is a Member of the North Carolina State Board of Elections. Mr. Carmon is sued in his official capacity.

50. Defendant Karen Brinson Bell is the Executive Director of the North Carolina State Board of Elections. Ms. Brinson is sued in her official capacity.

13

## STATEMENT OF FACTS

### A.   North Carolina's Absentee Ballot Integrity Statutes

51.     In 2001, the General Assembly made absentee voting available to all voters, who may choose to vote absentee for no stated reason.  N.C. Gen. Stat. § 163-226(a).  Recognizing, however, that absentee voting by its nature is less transparent than voting in person, the General Assembly has for a long time adopted several related provisions to ensure that absentee voting would be conducted without fraud or suspicion of fraud, that absentee voting could be administered in an efficient and fair way, and that public confidence in the election process and results would be maintained.

52.     Among those provisions was the Witness Requirement.  To cast a valid absentee ballot, North Carolina law ordinarily requires a voter to mark a ballot "in the presence of two persons who are at least 18 years of age," and to "[r]equire those two persons . . . to sign application and certificate as witnesses and to indicate those persons' addresses." N.C.G.S. § 163-231(a) [the "Witness Requirement"].

53.     In addition, N.C.G.S. § 163-231 states that absentee ballots must be returned "not later than 5:00 P.M. on the day of the statewide primary or general election or county board election." *Id.* § 231(b)(1).  The law also explicitly states that any ballots received after 5:00 PM on the day of the election "**shall not be accepted** unless . . . [1] the ballots issued under this Article are postmarked and that postmark is dated on or before the day of the statewide primary or general election or county bond election [the "Postmark Requirement"] and [2] are received by the county board of elections not later than three days after the election by 5:00 p.m. [the "Receipt Deadline"]" *Id.* § 231(b)(2) (emphasis added).

14

54.     North Carolina law also regulates who may return an absentee ballot and where it may be returned (the "Ballot Harvesting Ban").  Ballot harvesters are usually third parties (*i.e.*, campaign workers, union members, political activists, paid personnel, volunteers, or others) who go door-to-door and offer to collect and turn in ballots for voters.  "In some documented cases, the workers collecting the ballots have entered into voters' homes to help them retrieve and fill out their ballots."  S. Crabtree, "Amid Covid Mail-In Push, CA Officials Mum on Ballot Harvesting," RealClear Politics (Apr. 24, 2020) (available at *https://www.realclearpolitics.com/articles/2020/04/24/amid_covid_mail-in_push).*  Ballot harvesting gives unknown third parties the opportunity to tamper with absentee ballots or dispose of ballots rather than returning them to the county for tallying.  As the Carter-Baker Report explains: "States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting 'third-party' organizations, candidates, and political party activists from handling absentee ballots." Carter Baker Report, p. 46.  One other well-recognized procedural safeguard to prohibit fraud through ballot harvesting is to prohibit third parties from collecting and returning another person's absentee or mail-in ballot.

**B.     North Carolina's Response to the COVID-19 Pandemic in an Election Year**

55.     Since early 2020, North Carolina and the rest of the Nation have been responding to the COVID-19 pandemic.  President Trump responded to reports of a "novel coronavirus" by taking a series of steps to limit its spread in the United States, leading up to an Executive Order on March 13, 2020 declaring a national emergency.  Like other states, North Carolina has responded to the COVID-19 pandemic by implementing public health measures that are designed to reduce transmission rates and enable residents to safely undertake a wide range of activities—including voting in person or by absentee ballot.

15

56.     Governor Roy Cooper declared a state of emergency in North Carolina beginning on March 10, 2020.  *See* Governor Cooper, Executive Order No. 116, at 1 (Mar. 10, 2020).[20]  He has subsequently issued a series of executive orders containing health and safety directives in an attempt to reduce North Carolina's COVID-19 case count and death rate.  Governor Cooper, Executive Order No. 163, at *2 (Sept. 4, 2020).[21]

57.     North Carolina's General Assembly recognized the need to adjust its voting procedures for the 2020 general election in response to the pandemic, and it took swift action address those concerns, including by amending absentee ballot procedures, by enacting HB 1169.

58.     Before passing HB 1169, the General Assembly spent a month and a half working on the bill[22] and considered many proposals.  Before then, the State Board of Elections proposed reducing the witness requirement for absentee ballots to one witness or replacing it with signature matching software.  Moreover, the General Assembly had the benefit of information about other primary elections conducted during the pandemic.  The General Assembly was also aware of concerns that the United States Postal Service might face challenges in delivering mail-in absentee ballots.

59.     The General Assembly was also intimately familiar with the recent election in North Carolina's Ninth Congressional District, which was tainted by "absentee ballot fraud" and needed to be held anew.  From that incident, the General Assembly understood the importance of

---

[20] *Available at* https://files.nc.gov/governor/documents/files/EO116-SOE-COVID-19.pdf.

[21] *Available     at*     https://files.nc.gov/governor/documents/files/EO163-Phase-2.5-Tech-Corrections_0.pdf.

[22] Jordan Wilkie, *NC House Passes Bipartisan Election Bill To Fund COVID-19 Response*, Carolina Public Press (May 29, 2020), *available at* https://carolinapublicpress.org/30559/nc-house-passes-bipartisan-election-bill-to-fund-covid-19-response/.  (listing many proposals and quoting Rep. Allison Dahle, D-Wake as saying "lawmakers have been working on this bill for a month and a half.").

restricting who can assist voters with the request for, filling out, and delivery of absentee ballots in order to prevent practices such as ballot harvesting. *See* Mar. 13, 2019 Order of the North Carolina State Board of Elections in *In The Matter Of: Investigation of Election Irregularities Affecting Counties Within the 9th Congressional District*, SBE_000001-46 at 2 (ordering new election).

60.     In June 2020, HB 1169 passed with overwhelming bipartisan majorities, by a vote of 105-14 in the North Carolina House and by a vote of 37-12 in the North Carolina Senate.[23] Governor Cooper, a Democrat, promptly signed the bill into law.

61.     In view of the pandemic, HB 1169 eases the Witness Requirement for the November 2020 election by reducing the required number of witnesses for an absentee ballot from two to one Session Law. 2020-17 (HB 1169) states very clearly, however, that ballots must still abide by the other requirements of N.C.G.S. § 163-231(a), and that a ballot may only be accepted "provided that the [witness] signed the application and certificate as a witness and printed that person's name and address on the container-return envelope." S.L. 2020-17 § 1.(a).    On information and belief, the General Assembly considered, and rejected, calls to eliminate the Witness Requirement altogether.

62.     In addition to these changes, HB 1169 also:

- Allowed voters to call the State or county board of elections to request a blank absentee ballot request form be sent to the voter via mail, e-mail, or fax. *Id* § 5(a);

- Enabled voters to request absentee ballots online.  *Id.* § 7.(a).

- Allowed completed requests for absentee ballots to be returned in person or by mail, e-mail, or fax.  *Id.* § 2.(a).

---

[23] HB 1169, Voting Record, *available at* https://www.ncleg.gov/BillLookUp/2019/H1169.

- Permitted "multipartisan team" members to help any voter complete and return absentee ballot request forms. *Id.* § 1.(c).

- Provided for a "bar code or other unique identifier" to track absentee ballots. *Id.* § 3.(a)(9).

These changes balanced the public health concerns of the pandemic against the legitimate needs for election security.

### C.    Court Decisions Affirming the General Assembly's Voting Procedures

63.    As part of a nationwide campaign to try to change duly enacted election laws and procedures in the courts, scores of lawsuits have been filed throughout the Nation seeking to loosen protections on absentee voting.   In North Carolina alone, seven lawsuits have been filed challenging various duly-enacted provisions of the State's election laws.  At least five of these suits seek to eliminate the Witness Requirement.  These efforts have been strikingly unsuccessful.

64.    On June 5, 2020, plaintiffs in *Democracy North Carolina v. North Carolina State Bd. of Elections*, No. 1:20-cv-457, __ F. Supp. 3d ___, 2020 WL 4484063 (M.D.N.C. Aug. 4, 2020) ("Democracy North Carolina") filed a motion for a preliminary injunction alleging that North Carolina's Witness Requirement violated the First and Fourteenth Amendments to the U.S. Constitution.  The plaintiffs in *Democracy North Carolina* lived alone, had preexisting conditions, and did not feel comfortable asking someone to witness the completion of their ballots. *Id.* at *24. On these bases, they alleged that the Witness Requirement unconstitutionally burdened their right to vote, and that North Carolina's interest in enforcing the Requirement did not outweigh this burden. *Id.*  The plaintiffs further alleged that the Witness Requirement would impact 1.1 million single member households. *Id.* Voters, they alleged, must choose between sacrificing their health

to vote in person or comply with the Witness Requirement, or foregoing the right to vote. *See Democracy North Carolina*, Am. Comp. ¶¶ 99–100 (Dkt. No. 30, June 18, 2020).

65.     The Board of Elections mounted a vigorous defense of existing voting regulations and the amended procedures enacted by the General Assembly by participating in depositions, arguing at court hearings, and filing a 47-page brief and five affidavits/declarations.  The oppositions included a detailed declaration by Karen Brinson Bell, Board Executive Director of the Board of Elections (Dkt. No. 50 & 50-1). The Board of Elections argued, and Executive Director averred, that the Witness Requirement is justified by a State interest in preventing voter fraud. *Id.*

66.     After a three-day evidentiary hearing and extensive argument, the District Court rejected these claims by the Plaintiffs in a comprehensive 188-page opinion and order. *See Democracy North Carolina*, 2020 WL 4484063.  The District Court held that the plaintiffs were unlikely to succeed on their challenge to the Witness Requirement, and denied their request for a preliminary injunction against that provision. *Id.* at *33.

67.     The District Court observed that the "disagreement between [the plaintiffs and the state was] largely dependent on the degree of risk and the resulting danger posed by that risk as imposed by the [ ] Witness Requirement on voter health." *Id.* at *25,

68.     After considering extensive evidence from several medical professionals, including treating physicians and epidemiologists, the court ruled that a "voter should be likely able to fill out and sign the two-page ballot in a relatively short period of time, including the witnessing process, in fewer than ten minutes," and therefore a person could "vote absentee by mail without serious risk by adhering to social distancing measures and following all CDC guidelines." *Id.* at *33. Any risk of touch transmission could be "mitigated, if not completely eliminated, by surface

19

cleaning and handwashing in accordance with CDC guidelines." *Id.* As a result, the Witness Requirement was not "unduly burdensome on even high-risk voters." *Id.* The court accordingly denied the plaintiffs' request for injunctive relief against the Witness Requirement. *Id.* at *64.

69.     On September 3, a three-judge panel in another case filed in Wake County Superior Court, *Chambers v. North Carolina*, Case No. 20-CVS-500124 (Sept. 3, 2020), denied Plaintiffs' motion for preliminary injunction concerning the Witness Requirement. *See* Order (Sept. 3, 2020). The Board of Elections was, again, named as a Defendant and, again, the State vigorously defended the General Assembly's voting procedures. Again, the State argued that the Witness Requirement is essential to deterring, detecting, and punishing voter fraud, and ensuring the integrity of North Carolina's elections. *See* State Def. Response to Mot. for Preliminary Inj., at 2, 31-33 (Aug. 26, 2020); State Def. Response to Mot. for Preliminary Inj., Ex. 1, Bell Affidavit ¶ 7 (Aug. 26, 2020).

70.     After briefing with evidentiary submissions by the State and holding a hearing, the three-judge panel held there was not a substantial likelihood that Plaintiffs would prevail on the merits of their claims regarding the Witness Requirement. *See id.* at 6. The court specifically held that "the equities do not weigh in [Plaintiffs'] favor" because of the proximity of the election, the tremendous costs that the plaintiffs' request would impose on the State, and the confusion it would cause voters. *Id.* at 7. The panel also determined that changes requested by Plaintiffs "will create delays in mailing ballots for *all* North Carolinians voting by absentee ballot in the 2020 general election and would likely lead to voter confusion as to the process for voting by absentee ballot." *Id.* (emphasis in original).

71.     Following the Court's ruling, the Board of Elections proceeded, pursuant to a statutory requirement, to mail absentee ballots to "more than 650,000" voters who had requested them. *See The November Election Season Has Officially Started, as North Carolina Begins*

20

*Sending Out Mail Ballots*, The Washington Post (Sept. 4, 2020) (indicating that on Sept. 4, the North Carolina had already begun mailing out more than 650,000 absentee ballots to voters).  As of September 25, 2020, the Board of Elections website indicates that 1,028,648 voters have requested absentee ballots, and that 239,705 completed ballots have already been returned.  *See* https://www.ncsbe.gov/results-data/absentee-data.

### D. Additional State Lawsuits Attempting to Overturn the General Assembly's Voting Statutes.

72. *Democracy North Carolina* and *Chambers* were not the only cases involving the Board of Elections in which Plaintiffs challenged voting laws enacted by the General Assembly. Five other cases have been filed before the Wake County Superior Court in North Carolina.[24]

73. On May 4, 2020, the North Carolina Board of Elections and its members were sued in *Stringer v. State*, Case No. 20-CVS-5615 (Wake Cty. Sup. Ct.).  Plaintiffs in the case challenged several absentee ballot procedures including the Witness Requirement, the Receipt Deadline, the Postmark Requirement, and the requirement that the signature on an absentee ballot match the signature of the registered voter that is on file with the county.

74. On July 8, 2020, the *Stringer* plaintiffs filed an amended complaint seeking declaratory relief that these requirements as amended in HB 1169, among others, violated the North Carolina Constitution. The *Stringer* plaintiffs also sought injunctive relief (1) prohibiting enforcement of the Witness Requirement, (2) extending the Receipt Deadline to match the deadline for military and overseas voters, (3) changing the burden of proof on the Postmark Requirement

---

[24] *See Advance North Carolina v. North Carolina*, Case No. 20-CVS-2965; *North Carolina Dem. Party*, Case No. 19-CVS-14688, *Democratic Senatorial Campaign Committee v. N.C. State Bd. of Elections*, No. 20-CVS-9947, *Stringer v. North Carolina*, Case No. 20-CVS-05615, and *North Carolina Alliance for Retired Americans v. North Carolina State Board of Elections*, Case No. 20-CVS-8881.

and expanding the meaning of "postmark," and (4) requiring the State to provide postage free of charge to voters, in addition to seeking attorneys' fees. *See* Stringer, Case No. 20-CVS-5615, Am. Compl. ¶ 6 & Prayer for Relief.

75. And on August 10, 2020, the Board of Elections was sued in *North Carolina Alliance for Retired Americans v. North Carolina State Board of Elections*, Case No. 20-CVS-8881 (Wake Cty. Sup. Ct.) ("*NC Alliance*"). The *NC Alliance* suit was brought by the same attorneys as the *Stringer* suit and the two complaints are very similar, but unlike *Stringer*, the *NC Alliance* Complaint purported to be an "as applied" rather than a "facial challenge" to the statutory provisions. On information and belief, the *NC Alliance* plaintiffs sought, by asserting an as applied challenge, to avoid assignment of the case to a three-judge court as required by N.C. Gen. Stat. § 1-267.1.

76. The Plaintiffs in *NC Alliance* challenged the same provisions as the *Stringer* plaintiffs, including the Witness Requirement and the Receipt Deadline. But the *NC Alliance* plaintiffs also challenged some new provisions, including the State's restrictions on persons who can assist a voter to complete an absentee ballot application and the ban on harvesting ballots. *See* N.C. Alliance, Case No. 20-CVS-8881, Amended Complt. ¶ 7 & Prayer for Relief (Aug. 18, 2020).

77. Like the *Stringer* plaintiffs, the *Alliance* plaintiffs requested declaratory relief that these requirements, among others, were unconstitutional and an injunction against their enforcement.

78. As of September 21, briefing on Plaintiffs' motions for preliminary injunction in both *Stringer* and *NC Alliance* was underway, and the Court had scheduled hearings on both motions for October 2. At least 17 depositions were scheduled to occur between September 21st

and September 30th. On September 24, the court granted the Republican Groups' motion to intervene in *NC Alliance*.

79.    But meanwhile, on September 21, 2020—only 11 days before hearings on both preliminary injunction motions—Plaintiffs and the Board of Elections publicly announced that they had reached a settlement and would seek a consent judgment (the "Consent Agreement"). The Consent Agreement is attached as Exhibit 1.

80.    Plaintiffs and the BOE negotiated the Consent Agreement in secret and the BOE purported to approve it in a closed, secret session. The Board of Elections never consulted with either of their co-defendants Timothy K. Moore, Speaker of the North Carolina House of Representatives, or Philip E. Berger, President Pro Tempore of the North Carolina Senate (the "Legislative Defendants")[25] before publicly announcing the Consent Agreement.

81.    Immediately upon announcing the Consent Agreement, the *Stringer* and *NC Alliance* plaintiffs abruptly withdrew their motions for preliminary injunction, unilaterally cancelled all remaining depositions, and announced they would seek court approval of the deal on October 2.

E.    **The State Board of Election's Vote Procedure Memoranda**

82.    In connection with the Consent Judgment, the Board of Elections issued three memoranda with new guidance to County Boards of Elections on administering the November general election (the "Numbered Memos"). The Numbered Memos are attached as Exhibits 2-4.

83.    The Board of Elections contends that the Memoranda with revised procedures are effective pursuant to N.C. Gen. Stat. § 163-27.1 and 08 NCAC 01.0106, which provide that the

---

[25] Although not originally named as defendants, the Legislative Defendants intervened in both *Stringer* and *Alliance* as a matter of right.

Executive Director of the Board of Elections "may exercise emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by any of the following: (1) A natural disaster[;] (2) Extremely inclement weather[;] or (3) An armed conflict involving Armed Forces of the United States, or mobilization of those forces, including North Carolina National Guard and reserve components of the Armed Forces of the United States." Neither the statute nor regulation identify health issues, including a pandemic, within the definition of "a natural disaster"[26] or "extremely inclement weather," and, of course, the COVID-19 pandemic has no relationship to an armed conflict involving armed forces of the United States. But even if the pandemic fell within those terms, the General Assembly has already addressed it in HB 1169. The Board is further limited by the Constitution of the United States.

84.     The Board also contends it has the authority to implement the new measures pursuant to N.C. Gen. Stat. § 163-22(a), which provides that the Board "shall compel observance of the requirements of the election laws by county boards of elections and other election officers."

85.     Far from observing the requirements of the election law, the Consent Agreement and the Numbered Memos directly and arrogantly usurp the General Assembly's authority as granted in Article I, section 4 of the United States Constitution, which vests authority to set the "Time, Places, and Manner of holding Elections for Senators and Representatives" exclusively in the State Legislature. The only exception is that the United States Congress may modify provisions duly enacted by a State Legislature. The Constitution recognizes no situation in which the

---

[26] "Natural disasters" and "extremely inclement weather" are defined to include hurricanes; tornados; storms or snowstorms; floods; tidal waves or tsunamis; earthquakes or volcanic eruptions; landslides or mudslides; or catastrophes arising from natural causes that result in a disaster declaration by the President of the United States or the Governor. *See* 08 NCAC 01 .0106(b)(1).

Case 1:20-cv-00912-WO-JLW   Document 1   Filed 09/26/20   Page 24 of 34

Executive Branch, or an Executive Branch agency, of a State may assert authority to enact such provisions.

86.    The BOE's deal with the Plaintiffs directly usurps and overrides several election law statutes duly enacted by the General Assembly, and thus abridges Article I, section 4 of the United States Constitution. For example, Numbered Memo 2020-22 unilaterally extends the Receipt Deadline. Whereas the statute allows the counting of ballots postmarked by Election Day if they are received within **three (3)** days after Election Day, N.C.G.S. § 163-231(b)(2), Numbered Memo 2020-22 states that "[a]n absentee ballot shall be counted as timely if . . . the ballot is postmarked on or before Election Day and received by **nine** days after the election." Exhibit 3 at 1.

87.    And then Numbered Memo 2020-22 proceeds unilaterally to undermine the Postmark Requirement.  Whereas the General Assembly allows the counting of ballots properly postmarked by Election Day and received by the county board of elections up to three days after the election, N.C.G.S. § 163-231(b)(2), Numbered Memo 2020-22 states that a ballot shall be *considered postmarked* by Election Day if [1] it has a postmark affixed to it **_or_** [2] if there is information in BallotTrax, or another tracking service offered by the USPS or a commercial carrier, indicating that the ballot was in the custody of USPS or the commercial carrier on or before Election Day.  The Memo instructs the County Board of Elections that, if a container return envelope arrives after Election Day and does not have a postmark, then county board staff shall conduct research to determine if there is information in BallotTrax to determine the date the ballot was in the custody of USPS; if the envelope has a tracking number after Election Day, staff shall conduct research with the USPS or commercial carrier to determine the date it was in the custody

25

of USPS/the carrier." Exhibit 3, at 2 (emphasis added). This is in direct contravention of N.C.G.S. § 163-231(b)(2) which states that a ballot **must** have a postmark to be accepted after Election Day.

88.     Moreover, Numbered Memo 2020-19 unilaterally negates the Witness Requirement, stating if a witness or assistant did not print their name, address, or sign the ballot, that the ballot may be cured by sending a certification *to the voter* for *the voter* to complete and return. Exhibit 2, at 2. Once the voter presents the requested certification, the ballot will be counted *with no witness*. This directly contradicts the requirements of current law, which states that a ballot may only be accepted if the witness "signed the application and certificate as a witness and printed that [witness'] name and address on the container-return envelope." S.L. 2020-17 at § 1.(a).

89.     The Board of Elections has also purported to undermine the duly-enacted Ballot Harvesting Ban. But Numbered Memo 2020-23 states that "[a] county board shall *not disapprove* an absentee ballot solely because it was delivered by someone who was not authorized to possess the ballot," nor "solely because it is placed in a drop box" located at the office of the county board of elections. Exhibit 4, at 2-3.

90.     Again, North Carolina law specifically prohibits the practices now promoted by the Board of Elections. The only absentee ballots that may be tallied in an election are those returned to the county board of elections no later than 5:00 p.m. on the day before election day in a properly executed container-return envelope *or* absentee ballots received pursuant to N.C. Gen. Stat. § 163-231(b)(ii) or (iii). *See* N.C. Gen Stat § 163-234(1). The latter category includes only ballots "transmitted by mail or by commercial courier service, at the voter's expense, or delivered in person, or by the voter's near relative or verifiable legal guardian." N.C. Gen. Stat. § 163-231(b).

91.     Indeed, North Carolina law disapproves of these practices so strongly that it has made it a Class I felony for any person other than the voter's near relative or legal guardian to take

26

possession of an absentee ballot of another voter for delivery or return to a county board of elections. *See* N.C.G.S. § 163-223.6(a)(5). The effect of Numbered Memo 2020-23 would be to require counting of all the tainted ballots submitted by McCrae Dowless, even if the Board knew those ballots were obtained illegally.

## CLAIMS

## COUNT ONE

### (Violation of Art. I, § 4 of the U.S. Constitution)

92.     Plaintiffs incorporate all previous allegations set forth herein.

93.     The United States Constitution provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. Art. I, § 4, cl. 1 (emphasis added).

94.     The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

95.     Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id*. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

96.     As detailed above, the Board of Elections has unilaterally changed the requirements and procedures for absentee voting in North Carolina, including the Witness Requirement, Postmark Requirement, Receipt Deadline, and prohibitions on Ballot Harvesting. These changes

97.     The General Assembly could not, consistent with the Constitution of the United States, delegate to the Board of Elections the power to suspend or re-write the state's election laws. Nor did the General Assembly do so.

98.     The Board of Election's changes violates the Article 1, § 4 of the U.S. Constitution.

27

99.     Defendants have acted and will continue to act under color of state law to violate the Constitution.

100.     The unlawful and abrupt changes to North Carolina voting procedures implemented by the North Carolina State Board of Elections are inflicting immediate and irreparable harm on the individual Plaintiffs, the Plaintiff candidates, the Republican Committees, their members, and supporters. The individual Plaintiffs, who have voted or intend to vote in the upcoming election, are at imminent risk of having their votes diluted and negated by the Board's actions. The candidate and the Republican Committees have spent substantial sums and expended significant time and resources to educate voters on North Carolina voting procedures. Due to the changes, they will lose the benefit of their previous efforts and must duplicate activities and spend additional sums to re-educate voters on the new requirements, which will divert their resources from get-out-the-vote efforts and candidate support.

101.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Board of Election's changes.

## COUNT TWO

### (Violation of Art. II, § 1 of the U.S. Constitution)

102.     Plaintiffs incorporate all their previous allegations set forth herein.

103.     The United States Constitution provides that "[e]ach State shall appoint, in such Manner as *the Legislature* thereof may direct, a Number of Electors" for President. U.S. Const. Art. II, § 1, cl. 2 (emphasis added).

104.     By changing the absentee ballot voting procedures, including the Witness Requirement, Postmark Requirement, Receipt Deadline, and prohibitions on Ballot Harvesting,

the Board of Elections changed the manner in which North Carolina voters will appoint electors during the November 3, 2020 presidential election.

105.    Defendants are not "the Legislature," and therefore have no power under the Constitution determine the manner in which North Carolinians will appoint electors. *See* U.S. Const. art. II, § 1.

106.    The General Assembly could not, consistent with the Constitution of the United States, delegate to the Board of Elections the power to suspend or alter the state's election laws. Nor did the General Assembly do so.

107.    The specified actions of the Board of Elections violate the U.S. Constitution.

108.    Defendants have acted and will continue to act under color of state law to violate the Constitution.

109.    The changes to North Carolina voting procedures implemented by the North Carolina State Board of Elections are inflicting immediate and irreparable harm on the individual Plaintiffs, the Plaintiff candidates, the Republican Committees, their members, and supporters. The individual Plaintiffs, who have voted or intend to vote in the upcoming election, are at imminent risk of having their votes diluted and negated by the Board's actions. The Plaintiff candidates and the Republican Committees have spent substantial sums and expended significant time and resources to educate voters on North Carolina voting procedures and encouraged individuals to vote in the general election.  Due to the changes, they will lose the benefit of their previous efforts and must duplicate activities and spend additional sums to re-educate voters on the new requirements, which will divert their resources from get-out-the-vote efforts and candidate support.

110.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the Board's changes.

## COUNT THREE

### (Dilution of the Right to Vote under the Fourteenth Amendment of the U.S. Constitution)

111.     Plaintiffs incorporate all previous allegations set forth herein.

112.     The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *See Harper v. Virginia State Board of Elections*, 383 U.S. 663, 665 (1966). *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections"). The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast.

113.     An individual's right to vote is infringed if his or her vote is cancelled or diluted by a fraudulent or illegal vote. *See Anderson*, 417 U.S. at 227. The United States Supreme Court has made this clear in several cases. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots"); *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

114.     The changes made by the Board of Elections contravene validly enacted election laws and eliminate or drastically weaken protections against voter fraud, and risk dilution of honest votes by enabling the casting of fraudulent or illegitimate votes. This dramatically enhanced risk of fraudulent voting violates the right to vote. *Reynolds*, 377 U.S. at 555; *Anderson*, 417 U.S. at 226-27; *Baker*, 369 U.S. at 208.

Case 1:20-cv-00912-WO-JLW   Document 1   Filed 09/26/20   Page 30 of 34

115. Defendants' new, unauthorized voting system facilitates fraud and other illegitimate voting practices, and therefore violates the Fourteenth Amendment to the U.S. Constitution.

116. Defendants have acted and will continue to act under color of state law to violate the Fourteenth Amendment.

117. The unlawful and abrupt changes to North Carolina voting procedures implemented by the North Carolina State Board of Elections inflict immediate and irreparable harm on the individual Plaintiffs, the Plaintiff candidates, the Republican Committees, their members, and supporters. The individual Plaintiffs, who have voted or intend to vote in the upcoming election, are at imminent risk of having their votes diluted and negated by the Board's actions. The Plaintiff candidates and Republican Committees have spent substantial sums and expended significant time and resources to educate voters on North Carolina voting procedures. Due to the changes, they will lose the benefit of their previous efforts and must duplicate activities and spend additional sums to re-educate voters on the new requirements, which will divert their resources from get-out-the-vote efforts and candidate support.

118. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing changes to absentee ballot voting procedures.

## COUNT FOUR

**(Denial of Equal Protection Under the Fourteenth Amendment of the U.S. Constitution)**

119. Plaintiffs incorporate all previous allegations set forth herein.

120. The Equal Protection Clause of the Fourteenth Amendment requires that "one person's vote must be counted equally with those of all other voters in a State." *Reynolds*, 377 U.S. at 560. In other words, "whenever a state or local government decides to select persons by popular election to perform governmental functions, [equal protection] requires that each qualified voter

31

must be given an equal opportunity to participate in that election … ." *Hadley*, *v. Junior College District*, 397 U.S. 50, 56 (1968).

121.     Therefore, the Equal Protection Clause of the U.S. Constitution prevents the government from treating similarly situated voters differently without a compelling justification for doing so. *Bush v. Gore*, 531 U.S. 98, 104-5 (2000) ("[H]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). The requirement of equal treatment is stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

122.     Accordingly, the Equal Protection Clause requires states to "'avoid arbitrary and disparate treatment of the members of its electorate.'" *Charfauros v. Bd. of Elections*, 249 F.3d 941, 951 (9th Cir. 2001) (quoting *Bush*, 531 U.S. at 105); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Gray*, 372 U.S. at 380 ("The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of [the Supreme Court's] decisions.").

123.     "[T]reating voters differently" thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros*, 249 F.3d at 954. Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush*, 531 U.S. at 105.

124.     Defendants have significantly changed the procedures for casting absentee ballots, including the Witness Requirement, Postmark Requirement, Receipt Deadline, and prohibitions on Ballot Harvesting, after vigorously defending those procedures in litigation while voting in the November 2020 general election was occurring. Accordingly, the State Board of Elections has

treated voters who have already voted and complied with these requirements, such as Ms. Wise, differently from voters who have not yet voted in the November 3, 2020 general election. Ms. Wise and other similarly situated voters, in turn, have been denied equal treatment under the Fourteenth Amendment to the U.S. Constitution.

125.     Defendants, through their acts or omissions, have violated the United States Constitution and infringed upon the equal protection rights of Plaintiffs, their members, and all qualified North Carolina voters.

126.     Defendants have acted and will continue to act under color of state law to violate the Equal Protection Clause of the United States Constitution.

127.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined and compelled to enforce the mandates of the Election Code.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and award the following relief:

(a)     A declaratory judgment that the "Consent Judgment" and related Numbered Memos violates the Art. I, §4, Art. II, § 1, and the Fourteenth Amendment to the U.S. Constitution;

(b)     A permanent injunction prohibiting Defendants from implementing and enforcing the "Consent Judgment" and the related Numbered Memos; A temporary restraining order and preliminary injunction granting the relief specified above during the pendency of this action;

(c)     Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

(d)  All other preliminary and permanent relief that Plaintiffs are entitled to, and that

the Court deems just and proper.

Dated: September 26, 2020

Respectfully submitted,

/s/ R. Scott Tobin
R. Scott Tobin, N.C. Bar No. 34317
Taylor English Duma LLP
4208 Six Forks Road, Suite 1000
Raleigh, North Carolina 27609
Telephone: (404) 640-5951
Email: stobin@taylorenglish.com

Bobby R. Burchfield (*special admission pending*)
Matthew M. Leland (*special admission pending*)
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006
Email: bburchfield@kslaw.com
Telephone: (703) 624-4914
Email: mleland@kslaw.com
Telephone: (202) 669-3869

*Counsel for Plaintiffs*