FILED: October 20, 2020

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 20-2104

———————

PATSY J. WISE; REGIS CLIFFORD; SAMUEL GRAYSON BAUM; DONALD J. TRUMP FOR PRESIDENT, INC.; GREGORY F. MURPHY, U.S. Congressman; DANIEL BISHOP, U.S. Congressman; REPUBLICAN NATIONAL COMMITTEE; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE; NORTH CAROLINA REPUBLICAN PARTY; CAMILLE ANNETTE BAMBINI,

     Plaintiffs – Appellants,

v.

DAMON CIRCOSTA, in his official capacity as Chair of the State Board of Elections; STELLA ANDERSON, in her official capacity as Secretary of the State Board of Elections; JEFF CARMON, in his official capacity as Member of the NC State Board of Elections; KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections; NORTH CAROLINA STATE BOARD OF ELECTIONS,

     Defendants – Appellees,

and

BARKER FOWLER; BECKY JOHNSON; JADE JUREK; ROSALYN KOCIEMBA; TOM KOCIEMBA; SANDRA MALONE; NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS; CAREN RABINOWITZ,

     Intervenors/Defendants – Appellees.

No. 20-2107

TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; BOBBY HEATH; MAXINE WHITLEY; ALAN SWAIN,

        Plaintiffs – Appellants,

v.

DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections; STELLA ANDERSON, in her official capacity as a member of the North Carolina State Board Elections; JEFF CARMON, III, in his official capacity as a member of the North Carolina State Board of Elections; KAREN BRINSON BELL, in her official capacity as the Executive Director of the North Carolina State Board of Elections,

        Defendants – Appellees,

and

BARKER FOWLER; BECKY JOHNSON; JADE JUREK; ROSALYN KOCIEMBA; TOM KOCIEMBA; SANDRA MALONE; NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS; CAREN RABINOWITZ

        Intervenors/Defendants – Appellees.

O R D E R

    Upon consideration of submissions relative to the emergency motions for injunction pending appeal, the court denies injunctive relief pending appeal.

Chief Judge Gregory, Judge Motz, Judge King, Judge Keenan, Judge Wynn, Judge Diaz, Judge Floyd, Judge Thacker, Judge Harris, Judge Richardson, Judge Quattlebaum, and Judge Rushing voted to deny the motions for injunction. Judge Wilkinson, Judge Niemeyer, and Judge Agee voted to grant the motions for injunction.

Judge Wynn wrote an opinion on the denial of emergency injunctive relief. Judge Motz wrote a concurring opinion. Judge Wilkinson and Judge Agee wrote a dissenting opinion in which Judge Niemeyer joined. Judge Niemeyer wrote a separate dissenting opinion.

For the Court

/s/ Patricia S. Connor, Clerk

WYNN, Circuit Judge, denying emergency injunctive relief:

The judges of the Fourth Circuit and our fellow judges on North Carolina's state and federal courts have done an admirable job analyzing these weighty issues under substantial time constraints. Our prudent decision today declines to enjoin the North Carolina State Board of Elections's extension of its deadline for the receipt of absentee ballots for the ongoing general election.

Reading the dissenting opinion of our colleagues Judge Wilkinson and Judge Agee, one might think the sky is falling. Missing from their lengthy opinion is a recognition of the narrowness of the issue before us. Importantly, the *only* issue we must now decide is Plaintiffs' request for an emergency injunction pending appeal regarding a single aspect of the procedures that the district court below refused to enjoin: an extension of the deadline for the receipt of mail-in ballots. *All ballots must still be mailed on or before Election Day.* The change is simply an extension from three to nine days after Election Day for a timely ballot to be received and counted. That is all.

Implementation of that simple, commonsense change was delayed by judicial intervention. To be sure, some of that intervention was by the state courts: although a state trial court approved of the ballot-receipt extension, a state appellate court stayed it pending appeal, a stay that was lifted late yesterday afternoon. *See* Defendants' Supp. Letter (Oct. 19, 2020). That stay was, of course, the state court's prerogative. But prior to the state appellate court's intervention, it was solely *federal court* intervention that kept this change from being implemented. Our dissenting colleagues would perpetuate that intervention now, despite the Supreme Court's admonitions against taking such action.

4

Yet North Carolina voters deserve clarity on whether they must rely on an overburdened Post Office to deliver their ballots within three days after Election Day. The need for clarity has become even more urgent in the last week, as in-person early voting started in North Carolina on October 15 and will end on October 31. As our dissenting colleagues so recently reminded us, a federal court injunction would "represent[] a stark interference with [North] Carolina's electoral process right in the middle of the election season," which is inappropriate because "the federal Constitution provides States—not federal judges—the ability to choose among many permissible options when designing elections," especially when the "law is commonplace and eminently sensible." *Middleton v. Andino*, No. 20-2022, 2020 WL 5752607, at *1 (4th Cir. Sept. 25, 2020) (Wilkinson and Agee, JJ., dissenting) (internal quotation marks omitted).

This fast-moving case is proceeding in state court and involves an ongoing election—two sound reasons for us to stay our hand. Because Plaintiffs have not established a likelihood of success on the merits—and because, in any event, *Purcell* and *Andino* require that we not intervene at this late stage—we rightly decline to enter an injunction pending appeal.

## I.

The North Carolina Alliance for Retired Americans and several individual voters filed suit against the State Board of Elections ("Board") in Wake County Superior Court on August 10, 2020, challenging, among other provisions, the state's requirement that mail-in ballots be received within three days of Election Day. Speaker Tim Moore and Senate

5

President Pro Tempore Phil Berger—two of the plaintiffs here—intervened as defendants alongside the Board on August 12.[1]

On September 15, the State Board voted unanimously—and in bipartisan fashion!—to extend the receipt deadline for this election until nine days after Election Day (November 12, 2020).[2] The *NC Alliance* plaintiffs agreed to a settlement based, in part, on this change. On September 22, they joined the Board in asking the state court to approve a Consent Judgment formalizing the new receipt deadline. The state court issued an order approving the Consent Judgment on October 2.[3] This October 2 order established the relevant status quo for *Purcell* purposes. Under this status quo, all absentee votes cast by Election Day and received by November 12 would be counted.

------

[1] The political-committee Plaintiffs in the *Wise* case before us also successfully intervened in the *NC Alliance* litigation on September 24, 2020, where they claimed to represent the interest of "Republican voters throughout the state." *Moore v. Circosta*, No. 20-2062, Defendants-Appellants' App'x at 286.

[2] This was far from a radical move. The Board regularly extends its absentee ballot receipt deadlines in response to the hurricanes that befall us in the autumn. *See* Emergency Order—Updated 11/5/1018, N.C. State Bd. of Elections (Nov. 5, 2018), https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Executive%20Director%20Orders/Order_2018-10-19.pdf (extending deadline to nine days after Election Day in response to Hurricane Florence); Second Emergency Executive Order, N.C. State Bd. of Elections (Sept. 6, 2019), https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/Executive%20Director%20Orders/Order2_2019-09-06.pdf (extending deadline to eight days after Election Day in response to Hurricane Dorian).

[3] The state court explicitly found that the Consent Judgment was the product of arms-length negotiations between the parties. *See Wise* Intervenor-Appellees' App'x at 37. Efforts to characterize this good-faith agreement as a collusive backroom deal bulldoze through that plainly supportable conclusion.

6

However, on September 26, Speaker Moore, Leader Berger, and others initiated two federal lawsuits in the Eastern District of North Carolina. On October 3—the day *after* the state court issued final judgment—Judge Dever granted those parties' request for a Temporary Restraining Order, preventing the Consent Judgment from going into effect.[4] Judge Dever's order thus suspended the status quo already created by the state court order.

On October 5, the Board filed emergency motions for administrative and temporary stays of the TRO—which it properly understood to be a preliminary injunction, in effect if not in name—pending appeal in this Court. While those motions were pending, on October 6, Plaintiffs filed a motion in the district court to formally convert the TRO into a preliminary injunction. On the same day, Plaintiffs sought a writ of supersedeas as well as a temporary stay and expedited review of the *NC Alliance* judgment from the North Carolina Court of Appeals.

A week went by. The Fourth Circuit panel assigned to hear the Board's motions to stay Judge Dever's TRO did not take any action. The district court finally ruled on the motions for preliminary injunctions on October 14. And on October 15, the state appellate court granted a temporary stay—a stay that it dissolved yesterday when it denied the petitions for writs of supersedeas. Accordingly, the ballot receipt extension has gone into effect. *See* Defendants' Supp. Letter (Oct. 19, 2020).

Again, before us now is only the issue of whether to grant an injunction—which a district court has already denied—of the ballot-receipt extension. Our dissenting colleagues

---

[4] By that order, Judge Dever also transferred the case to Judge Osteen in the Middle District of North Carolina.

apparently believe the witness-requirement issue is also before us, as their opinion is peppered with references to it, and even proposes to order injunctive relief on that point. *See* Wilkinson and Agee Dissenting Op. at 46. Yet, as Plaintiffs themselves vigorously assert, "the *only* aspect of the revised Numbered Memo 2020-19 that Appellants are seeking to enjoin is the extension of the receipt deadline." *Moore* Reply Br. at 1; *see also Wise* Reply Br. at 3 (noting that the most recent version of the memo issued by the Board "honor[s] the Witness Requirement"). And indeed, as the district court noted, the one-witness requirement remains in place under the district court's August 4, 2020 injunction. *Moore v. Circosta*, No. 1:20CV911, 2020 WL 6063332, at \*2 (M.D.N.C. Oct. 14, 2020). The injunction our colleagues propose to issue on the witness requirement is therefore inappropriate, and their references throughout their opinion to that aspect of the parties' dispute are inapposite.

## II.

From the outset, *Purcell* strongly counsels *against* issuing an injunction here.

The status quo is plainly that the ballot-receipt extension is in place. The extension took effect after the district court's TRO expired (October 16) and the state appellate court dissolved its temporary administrative stay (October 19). But even before those injunctions lifted, the ballot-receipt extension has been the status quo ever since the trial court approved the settlement (October 2).

The Supreme Court's recent decision in *Andino* instructs that it is not federal court decisions, but state decisions, that establish the status quo. In *Andino*, there was a state law in place that was modified by a federal court injunction for the primaries; the state law

8

continued to be in place for the November election; and the district court again enjoined it. My view was that the injunction at the time of the primaries—establishing the rules when voters most recently voted—was the status quo. *Middleton v. Andino*, No. 20-2022, 2020 U.S. App. LEXIS 31093, at \*10 (4th Cir. Sep. 30, 2020) (Wynn, J., concurring). But our dissenting colleagues disagreed, viewing the state law as the status quo and federal court intervention as inappropriate under *Purcell*. *See Middleton*, 2020 WL 5752607, at \*1 (Wilkinson and Agee, JJ., dissenting). The Supreme Court agreed with our colleagues. *Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at \*1 (U.S. Oct. 5, 2020). Apparently, then, it is the state's action—not any intervening federal court decision—that establishes the status quo.

Here, the state's action was to implement the challenged modifications.[5] The status quo was therefore established on October 2, when the state court approved the Consent Judgment in *NC Alliance*. The district court below agreed. *See Moore*, 2020 WL 6063332, at \*23 (refusing to enjoin the absentee ballot receipt deadline extension as it would be inappropriate to cause confusion by "changing [the] election rules" the state established on October 2). *Purcell* and *Andino* therefore require that we refuse to enter an injunction here.

Further, contrary to our dissenting colleagues' assertion, Wilkinson and Agee Dissenting Op. at 44–45, *Purcell* is about *federal court* intervention. *See, e.g.*, *Andino*,

---

[5] Our dissenting colleagues believe that we must defer to the General Assembly over the Board. Wilkinson and Agee Dissenting Op. at 22. But whether the Board may properly act as an agent of the state legislature is a complicated question of state law that is, at this moment, being litigated in state court. As discussed below, *Pullman* abstention requires that we refrain from injecting ourselves into the middle of this dispute.

9

2020 WL 5887393, at *1 (Kavanaugh, J., concurring) ("[F]or many years, this Court has repeatedly emphasized that *federal courts* ordinarily should not alter state election rules in the period close to an election." (emphasis added)); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that *lower federal courts* should ordinarily not alter the election rules on the eve of an election." (emphasis added)); *Andino*, 2020 WL 5752607, at *1 (Wilkinson and Agee, JJ., dissenting) ("[T]he federal Constitution provides *States—not federal judges*—the ability to choose among many permissible options when designing elections. The [contested injunction] upends this whole structure and turns its back upon our federalist system." (internal quotation marks and citation omitted) (emphasis added)); *cf. Scarnati v. Boockvar*, No. 20A53, 2020 U.S. LEXIS 5182, at *1 (Oct. 19, 2020) (denying by divided vote an application for stay of decision by Pennsylvania Supreme Court extending deadline for receipt of absentee ballots); *Republican Party of Pa. v. Boockvar*, No. 20A54, 2020 U.S. LEXIS 5181, at *1 (Oct. 19, 2020) (same).

Our dissenting colleagues' attempt to stretch *Purcell* beyond its clear limits to cover not just federal court action, but also action by state courts *and* state executive agencies acting pursuant to a legislative delegation of authority, proves too much. They cite no authority for this expansion, and there is none.

Indeed, our dissenting colleagues' assertion that "there is no principled reason why this rule should not apply against interferences by state courts and agencies," Wilkinson and Agee Dissenting Op. at 44, flips *Purcell* on its head: our colleagues *justify* federal court intervention—the one thing *Purcell clearly* counsels against—based on their own notions

10

of what the Supreme Court *should have* said in *Purcell*. We cannot agree with such an expansion of federal court power at the expense of states' rights to regulate their own elections.[6] To do so would amount to inappropriate judicial activism.

III.

Turning to whether Plaintiffs are likely to succeed on the merits, the district court concluded that the Board likely violated the Equal Protection Clause when it extended the deadline for receipt of civilian absentee ballots postmarked by Election Day from three days after Election Day to nine days after Election Day. The court relied heavily on *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam). *See Moore*, 2020 WL 6063332, at *17, 19. *Bush* prohibits arbitrary and disparate treatment in the valuation of one person's vote in relation to another's.[7]

---

[6] Additionally, the primary justification behind the *Purcell* principle—as our dissenting colleagues correctly state—is to avoid "chaos." *See* Wilkinson and Agee Dissenting Op. at 23, 34, 46; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (noting that "[c]ourt orders affecting elections" can create "voter confusion"). It is difficult to conceive what chaos our colleagues can possibly be envisioning here. *Voter behavior cannot be impacted by our decision one way or another.* Voters *must* postmark their mail-in ballots on or before Election Day. Thus, the deadline extension only changes two things: more votes cast by mail will be counted rather than discarded because of mail delays, and fewer voters will have to risk contracting the novel coronavirus by voting in person. Only a grotesquely swollen version of *Purcell* would consider this "voter confusion," or in any way harmful.

[7] Of course, *Bush* is of limited precedential value. *See Bush*, 531 U.S. at 109 ("Our consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities."). This analysis treats it as binding for present purposes.

11

This case totally lacks the concern with arbitrary or disparate standards that motivated *Bush*. The standard could not be clearer or more uniform: *everyone* must cast their ballot on or before Election Day, and the ballot will be counted for *everyone* as long as it is received within nine days after Election Day. Nor will the ballot receipt extension lead to the "unequal evaluation of ballots," another worry in *Bush*. 531 U.S. at 106. Everyone's ballot is worth the same under the extension.

Looking beyond *Bush*, there appears to be no support for the district court's equal protection conclusion anywhere in our jurisprudence. Here, no voter will be treated differently than any other voter as everyone will be able to have their absentee ballots counted if mailed in on time and received on time. Moreover, in a sharp departure from the ordinary voting-rights lawsuit, *no one was hurt by this deadline extension*. The extension does not in any way infringe upon a single person's right to vote: all eligible voters who wish to vote may do so on or before Election Day.

Indeed, several of the plaintiffs have already voted. *See Moore*, 2020 WL 6063332, at *1–2. The extension simply makes it easier for more people to vote absentee in the middle of a global pandemic that has killed over 200,000 Americans. How this implicates the Equal Protection Clause—a key provision of the Reconstruction Amendments that protects individuals' right to *equal protection* under the law[8]—is beyond our understanding.

---

[8] *Cf. Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), *as amended* (July 27, 2020) (Niemeyer, J.) ("Despite the plaintiffs' argument to the contrary, no vote . . . is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally.").

12

But there is more. Plaintiffs' equal protection argument is plainly in conflict with the Supreme Court's recent action in *Andino*, where the Court permitted votes that lacked a witness signature to be counted so long as they were cast before the Supreme Court's stay issued and were received within two days of the order. *Andino*, 2020 WL 5887393, at *1. If the Board's absentee ballot receipt deadline violates the Equal Protection Clause by changing rules mid-election, so did the Supreme Court's order in *Andino*.

Nor is the perfunctory analysis of our dissenting colleagues on this point persuasive: they merely reference state officials applying "different rules to different voters in the same election" and concerns about "the diluting effect of illegal ballots." Wilkinson and Agee Dissenting Op. at 42–43. Whether ballots are *illegally* counted if they are received more than three days after Election Day depends on an issue of state law from which we must abstain.

As for applying different rules to different voters, again, the Board's change does no such thing. All voters must abide by the exact same restriction: they must cast their ballots on or before Election Day. The change impacts only an element outside the voters' control: how quickly their ballots must be received to be counted. This change, of course, may have its own important consequences for the health of our citizenry—in terms of unnecessary infections avoided—and our democracy—in terms of lawful ballots cast and counted.

## IV.

Plaintiffs also believe that the Board violated the Elections Clause when they extended the absentee ballot receipt deadline. But as the district court properly concluded,

13

Plaintiffs lack standing to bring their Elections Clause claim. *Moore*, 2020 WL 6063332, at *23–25. Two of the plaintiffs in *Moore* are leaders of their respective chambers in the North Carolina General Assembly: the Speaker of the House (Moore) and the President Pro Tempore of the Senate (Berger).

In their current request for an injunction, they argue that they have standing to bring an Elections Clause claim on behalf of the North Carolina General Assembly pursuant to N.C. Gen. Stat. § 120-32.6(b), which provides in relevant part that "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State through the General Assembly, shall be necessary parties." This provision does nothing to confer standing on Plaintiffs Moore and Berger because the subject of this action is a change by the Board, not the validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution.

## V.

Furthermore, even if Plaintiffs had standing to pursue the Elections Clause issue, the *Pullman* abstention doctrine strongly counsels us, as a federal court, against exercising jurisdiction over that claim. *Pullman* abstention applies where "there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive." *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 174 (4th Cir. 1983) (internal quotation marks omitted).

14

Here, Plaintiffs are asking federal courts to determine whether the Board acted within the scope of its authority delegated by the Legislature. This is a close issue of *state* law involving competing interpretations of North Carolina's statutes governing election procedures and implicating complex questions concerning the separation of powers in the state. None of the parties have suggested or argued that state courts have already settled this issue conclusively. Indeed, the state court that approved the Consent Judgment considered and rejected Plaintiffs' argument as to this issue, while the district court reached the opposite conclusion. *See Wise* Intervenor-Appellees' App'x at 454–56; *Moore*, 2020 WL 6063332, at *26–30. This very conflict suggests that the issue is far from settled.[9]

Nor is there any question that the resolution of this state law question is "potentially dispositive." *Educ. Servs.*, 710 F.2d at 174. If a reviewing state court decides that the Board acted within its authority, then there is plainly no Elections Clause problem. Conversely, if the state court concludes that the Board lacked authority and declares the Consent Judgment invalid, we will no longer have a case since that would moot all of the federal constitutional claims.

Indeed, we have previously deemed *Pullman* abstention appropriate where the resolution of an issue concerning state delegation of authority would moot the constitutional questions presented. *See K Hope, Inc. v. Onslow Cnty.*, 107 F.3d 866 (4th

---

[9] That being said, a state trial court approved of the ballot-receipt extension, and a state appellate court declined to enjoin it. Accordingly, all evidence suggests that the state courts do not believe the Board acted beyond its authority in ordering the extension.

15

Cir. 1997) (unpublished table disposition). And contrary to the district court's misstatement, *Moore*, 2020 WL 6063332, at \*11, the state-law question concerning the scope of the Board's authority remains squarely before the state courts.[10] *See Wise* Intervenor-Appellees' App'x at 686–92. "Where there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim," the Supreme Court has "regularly ordered abstention." *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83 (1975).

Few cases implicate the "dual aims" of the *Pullman* abstention doctrine—"avoiding advisory constitutional decisionmaking" and "promoting the principles of comity and federalism"—more strongly than this one. *Pustell v. Lynn Pub. Schs.*, 18 F.3d 50, 53 (1st Cir. 1994). Thus, we should abstain from "needless federal intervention into local affairs." *Id.*

Plaintiffs do not have standing to pursue their Elections Clause claim anyway. But nonetheless, this issue may have implications for their Equal Protection claim as well.

In assessing Plaintiffs' likelihood of success on the merits regarding their Equal Protection challenge to the receipt deadline extension, the district court rested its analysis in part on the fact that the "change contravenes the express deadline established by the General Assembly," which is three days after Election Day. *Moore*, 2020 WL 6063332, at \*19; *see also* Wilkinson and Agee Dissenting Op. at 43 (appearing to agree with the district

---

[10] Accordingly, although the district court is of course correct that we generally "must predict how [a state's] highest court would rule" when it has not yet done so, here, we need not guess: we may simply allow this lawsuit to proceed, as it is presently doing, in the state courts. *Moore*, 2020 WL 6063332, at \*30.

court's analysis on this point by referring to "the diluting effect of illegal ballots"). Of course, if the Board is the agent of the Legislature for purposes of the Elections Clause— the very state-law issue from which we must abstain deciding—there is no contravention and there are no illegal ballots.

VI.

In sum, Plaintiffs are not likely to succeed on the merits with their novel Equal Protection theory. They lack standing to raise their Elections Clause challenge; even if they did not, we ought to exercise *Pullman* abstention. Furthermore, all suggestions from the state courts point to the conclusion that the Board properly exercised its legislative delegation of authority. There is no irreparable harm from a ballot extension: again, *everyone must submit their ballot by the same date*. The extension merely allows more lawfully cast ballots to be counted, in the event there are any delays precipitated by an avalanche of mail-in ballots.

And the balance of equities is influenced heavily by *Purcell* and tilts against federal court intervention at this late stage. *Andino* establishes that the appropriate status-quo framework is the status quo created by the state's actions, not by later federal court interventions. We ought not to perpetuate any further this inappropriate intervention by granting the "extraordinary and drastic remedy" of a preliminary injunction. *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 241 (4th Cir. 2020) (Wilkinson, J.) (quoting *Munaf v. Geren*, 553 U.S. 674, 690–91 (2008)). Such a remedy would be particularly extraordinary here, where the injunction would be granted by a federal appellate court in the first instance— after a federal trial court, state trial court, *and* state appellate court all declined to do so.

17

And even if reasonable minds can disagree on the merits, an injunction is still inappropriate here. The district court believed that Plaintiffs were *likely to succeed* on their equal protection claims. But, pursuant to *Purcell*, the court concluded that injunctive relief was inappropriate at this late date. *Moore*, 2020 WL 6063332, at *1. We rightfully do not disturb that sound judgment from a judge who has been thoughtfully considering these matters for months. Nor need we: the state appellate court has itself exercised control over this matter and the Supreme Court of North Carolina stands ready to act thereafter. As the district court wisely recognized, there is no need, in the middle of an ongoing election, for the federal courts to intervene into the voting affairs of North Carolina.

Accordingly, this Court must deny the requested injunction. To do otherwise would risk endangering a great many of our doctrines, to say nothing of the health of the voters of North Carolina as they attempt to safely exercise their right to vote.

18

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the denial of emergency injunctive relief:

I concur in full with Judge Wynn's excellent opinion for the court. I write separately to reiterate just two points.

First, recent actions of the Supreme Court make clear that it is up to a state to decide what election procedures are in effect on Election Day, and not federal courts. *See, e.g.*, *Republican Party of Pa. v. Boockvar, Sec. of Pa.*, No. 20A54, 592 U.S. --- (Oct. 19, 2020); *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020). Indeed, in a case strikingly similar to this one, the Supreme Court recently declined to grant a stay where "the state election officials support the challenged decree." *Republican Nat'l Comm. v. Common Cause Rhode Island*, No. 20A28, 2020 WL 4680151 (U.S. Aug. 13, 2020). So too here. The North Carolina legislature by statute conferred authority on the Board of Elections to "exercise emergency powers to conduct an election in a district where the normal schedule is disrupted by" a "natural disaster." N.C. Gen. Stat. § 163-27.1. That two individual legislators disagree with this delegation of power by the legislature is of no moment: "individual members [of a state legislature] lack standing to assert the institutional interests of a legislature" absent clear authorization. *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019).

Second, the plaintiffs' equal protection argument is deeply troubling. Quite unlike the ordinary challenge to state election procedures, plaintiffs here have not asserted *any* injury to their fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Rather, they challenge measures that remove burdens on other citizens exercising

19

their right to vote. The dissent seeks to recast these measures, aimed at maximizing citizens' ability to have "a voice in the election," *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964), as ones with nefarious "diluting effect[s]," Dissenting Op. at 43 (quoting *Gray v. Sanders*, 372 U.S. 368, 380 (1963)). Not so. To be sure, a state "may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 105 (2000). But if the extension went into effect, plaintiffs' votes would not count for less *relative to other North Carolina voters.* This is the core of an Equal Protection Clause challenge. *See Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("Simply stated, an individual's right to vote . . . is unconstitutionally impaired when its weight is in a substantial fashion diluted *when compared with* votes of citizens living on other parts of the State.") (emphasis added). The extension does not dilute some votes relative to others — rather, it has the same effect on all North Carolina voters.

20

WILKINSON and AGEE, Circuit Judges, with whom NIEMEYER, Circuit Judge, joins, dissenting:

We dissent from the court's grant of a hearing *en banc* in this case and the failure of the court to grant appellants' motions for injunctions against the North Carolina State Board of Elections pending appeal. Because of this case's importance, we judge it is necessary to lay out our reasoning with clarity. This course is necessary in order to draw attention to the accelerating pace of pre-election litigation in this country and all the damaging consequences ensuing therefrom.[1]

Here, as in *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020), we are faced with nonrepresentative entities changing election law immediately preceding or during a federal election. In making those changes, they have undone the work of the elected state legislatures, to which the Constitution clearly and explicitly delegates the power to "prescribe[]" "[t]he Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. The Constitution does not assign these powers holistically to the state governments but rather pinpoints a particular branch of state government—"the Legislatures thereof." *Id.* Whether it is a federal court—as it was in *Andino*—or a state election board—as it is here—does not matter; both are unaccountable entities stripping

---

[1] Two cases are consolidated before us: *Moore v. Circosta*, No. 20-2107, and *Wise v. Circosta*, No. 20-2104. For the sake of concision, we refer to Timothy Moore, Speaker of the North Carolina House of Representatives, and Philip Berger, President Pro Tempore of the North Carolina Senate, as the "legislative leader plaintiffs" and all the individual voter plaintiffs in both cases as the "voter plaintiffs." The defendants in both cases are the North Carolina State Board of Elections and its officers, members, and Chair, whom we refer to collectively as "the Board."

21

power from the legislatures. They are changing the rules of the game in the middle of an election—exactly what *Purcell v. Gonzalez*, 549 U.S. 1 (2006), counsels against. By the time the Board changed the rules, voters had cast over 150,000 ballots in North Carolina.

Let's understand the strategy that is being deployed here. The status quo is the election law enacted by the North Carolina General Assembly. The Constitution grants state legislatures that power. Principles of democratic accountability reinforce it. The fair notice to all voters of election ground rules well in advance of Election Day commend it.

Then along come the disruptive efforts of federal courts or, in this case, a state election board to upend the set rules right in the middle of an election. The disruptors then hail their action as the new status quo, which is (the irony of this is rich) claimed to be beyond any power of disturbance.

It takes no special genius to know what this insidious formula is producing. Our country is now plagued by a proliferation of pre-election litigation that creates confusion and turmoil and that threatens to undermine public confidence in the federal courts, state agencies, and the elections themselves.

Only by repairing to state legislative intent can we extricate ourselves from this debilitating condition. The statutes of state legislatures are our sole North Star. When, as here, the plain wording of those enactments is transgressed, the entire body politic pays a grievous price. In the service of policy objectives, the majority is stripping state legislatures of the responsibility our founding charter has assigned them. And in so doing, it has encouraged others to regard state statutes as little more than advisory and for pre-election litigants fair game.

22

Sometimes the state legislature will be in the hands of one party. Sometimes it will be in the hands of the other. Sometimes control may be divided. It matters not. These laws are what we as a nation have to live by, and to witness our democratic dissolution in this manner is heart-rending for the many good Americans of all persuasions who still view partisan advantage as subordinate to their country's lasting welfare.

As for *Scarnati v. Boockvar*, No. 20A53, 2020 WL 6128194 (U.S. Oct. 20, 2020), where a stay was denied by the Supreme Court on a 4-4 vote: the circumstances here are materially different. For one thing, the petition in *Boockvar* was brought to the court by representatives of a single house of the Pennsylvania legislature, whereas here representatives of both houses are united in their petition before the courts. In addition, the questionable circumstances that plainly indicated a state agency's subversion of the state legislature's intent were not present in the Pennsylvania case. The agency's extension of the statutory receipt deadline for mailed absentee ballots was twice as long as in the Pennsylvania suit. Nor did the Pennsylvania action involve the elimination by an agency of a statutory witness signature requirement. In short, this case presents a clean opportunity for the Supreme Court to right the abrogation of a clear constitutional mandate and to impart to the federal elections process a strong commitment to the rule of law.

Allowing the Board's changes to go into effect now, two weeks before the election and after half a million people have voted in North Carolina, would cause yet further intolerable chaos. Thus for the reasons that follow, we dissent and would grant the request for an injunction pending appeal. We urge plaintiffs to take this case up to the Supreme Court immediately. Not tomorrow. Not the next day. Now.

23

I.

A.

On June 12, 2020, Governor Roy Cooper signed into law the Bipartisan Elections Act of 2020 (Bipartisan Elections Act), in which an overwhelming bipartisan majority of the General Assembly amended North Carolina's election procedures. *See* 2020 N.C. Sess. Laws § 2020-17. Responding to the COVID-19 pandemic, the bill altered the state's election law to facilitate safe voting, while maintaining the integrity of the state's elections. In one key part, the law reduced the witness requirement for absentee ballots from two witnesses to one witness on the condition that the witness include his or her name and address with their signature. *See id.* § 1.(a). The General Assembly also left in place the deadline for receipt of absentee ballots postmarked on or before Election Day; that deadline continued to be "three days after the election by 5:00 p.m." N.C. Gen. Stat. § 163-231(b)(2)b.

A series of state and federal lawsuits followed the passage of this law, challenging its contents as well as unchanged provisions of North Carolina's election code.

In the first federal case, Democracy North Carolina and several North Carolinian voters sued the Board in the Middle District of North Carolina. The court allowed the Speaker of the North Carolina House of Representatives (Speaker) and the President Pro Tempore of the North Carolina Senate (President Pro Tempore) to intervene in the case. On August 4, Judge Osteen issued an order granting in part and denying in part the preliminary injunction requested by the plaintiffs. *See Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20-CV-457, 2020 WL 4484063, at *64 (M.D.N.C. Aug. 4, 2020).  He

24

upheld the one-witness requirement as constitutional and declined to supplant the legislature by ordering the establishment of contactless drop boxes. *Id.* at \*36, \*45.

B.

Not even a week after Judge Osteen issued his opinion and order, the North Carolina Alliance for Retired Americans and a different set of individual voters filed suit against the State Board of Elections in the North Carolina Superior Court for the County of Wake. On August 12, the Speaker and the President Pro Tempore filed a notice of intervention as of right. On August 18, the plaintiffs requested a preliminary injunction and filed briefing and evidence in support on September 4. On September 22, the plaintiffs and the Board defendants jointly moved for entry of a consent decree. The legislative defendant-intervenors opposed entry of the decree.

The consent decree ordered three changes to North Carolina's election procedures.[2] First, the decree extended the statutory receipt deadline for mailed absentee ballots postmarked on or before Election Day by six days. *Moore* Appellant App. at 35. That change trebled the legislature's receipt deadline from three days to nine. Second, the decree effectively eliminated the witness requirement for absentee ballots by creating a cure process through which voters could—without a witness—self-certify their ballots. *See id.* at 36. Third, the decree required the establishment of "a separate absentee ballot drop-off station at each one-stop early voting location and at county board offices." *Id.*

---

[2] These changes were outlined in three Board memoranda: the September 2020-19 memo, the Numbered Memo 2020-22, and the Numbered Memo 2020-23.

25

On September 26, the Speaker and the President Pro Tempore along with three individual voters sought a TRO and preliminary injunction in the Eastern District of North Carolina to prohibit the implementation of these changes.

On October 2, the state court entered the consent judgment, which it explained in an October 5 opinion. The North Carolina Court of Appeals issued an administrative stay against the consent decree on October 16, 2020, and lifted it without opinion on October 19, 2020.

On October 3, Judge Dever, the federal judge in the Eastern District of North Carolina, granted the requested TRO enjoining the implementation of the State Board's three memoranda until October 16, 2020, and transferred the case to Judge Osteen to hold preliminary injunction hearings in conjunction with *Democracy N.C. Moore v. Circosta*, No. 5:20-CV-507-D, 2020 WL 5880129, at *9 (E.D.N.C. Oct. 3, 2020). Without considering plaintiffs' Elections Clause claim, Judge Dever found their Equal Protection Clause arguments "persuasive." *Id.* at *5. He found that, by changing election rules after the North Carolina election had begun, the Board "ignored the statutory scheme and arbitrarily created multiple, disparate regimes under which North Carolina voters cast absentee ballots." *Id.* at *7. These actions led to a high likelihood of "a debasement or dilution of the weight of a citizen's vote," *id.* at *6 (quoting *Reynolds v. Sims*, 377 U.S. 533, 554 (1964)), and an "arbitrary or disparate treatment of members of [the state's] electorate," *id.* (quoting *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curiam)) (alteration in original). The court issued the TRO as necessary "to maintain the status quo." *Id.* at *7 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4–6 (2006) (per curiam)).

26

C.

After hearings, Judge Osteen denied the preliminary injunction. He rejected the defendant Board's arguments that (1) the court lacked jurisdiction, (2) abstention was appropriate, and (3) collateral estoppel barred the plaintiffs' claims. *Moore* Appellant App. at 93–101.  In *Democracy North Carolina*, Judge Osteen issued an All Writs Act injunction that prohibited the Board from instituting the witness requirement cure procedure, and that injunction is not before this court on appeal.  We note, however, that Judge Osteen found that the Board (1) "mischaracterize[ed]" his August 4 "injunction in order to obtain contradictory relief in another court," *Wise* Appellant App. at 386,  and (2) misrepresented to him the arguments that it made to the state court, *see id.* at 388–89.

Considering the voter plaintiffs' Equal Protection Clause claims first, Judge Osteen found that none had standing on their vote dilution theory, but that they did have standing on their arbitrary and disparate treatment theory. *Id.* at 107–08. The voter plaintiffs articulated a cognizable injury for that theory because they had already cast their absentee ballots and thus had to meet a different standard for voting than the absentee voters who had not yet voted when the Board issued its changes in September. *Id.* at 111–14. On the Elections Clause claim, the court held that the legislative leaders lacked standing because "[t]he General Assembly ha[d] not directly authorized Plaintiffs to represent its interests in this specific case," but rather its statutory authorization covered only intervening as defendants when the constitutionality of a North Carolina statute was challenged. *Id.* at 140–43.

27

Judge Osteen found that the voter plaintiffs had established a likelihood of success on the merits. *Id.* at 121. The Board's actions were arbitrary because its witness cure process contravened the duly enacted laws of the state legislature. *See id.* at 122–23. The Board's procedure allowed votes for which there was no witness at any point in the process, and this created a preferred class of voters. *Id.* at 124. Judge Osteen noted that his August 4 injunction did not require the Board to do this, so it could not be the basis of settling the state court lawsuit through the consent decree, which he characterized as "secretly-negotiated." *Id.* at 83, 124. The extension of the ballot deadline was also arbitrary because the change "contravene[d] the express deadline established by the General Assembly." *Id.* at 126. Since these constitutional violations could not be remedied after the election, he found that the voters would suffer irreparable harm. *Id.* at 134. However, he found that the balance of the equities weighed against relief because he believed the *Purcell* principle, which bars courts from changing election rules shortly before federal elections, applied to prohibit him from entering an injunction so close to an election. *Id.* at 135–37.

Despite not finding standing for the legislative plaintiffs, Judge Osteen nevertheless addressed the merits of the Elections Clause claim and found that the Board had exceeded its authority under North Carolina law because its rules had created "an unnecessary conflict with the legislature's choice" when it was under a statutory mandate to minimize conflict with the state's election law. *Id.* at 154.

On October 15, the legislative leaders and the voter plaintiffs filed a notice of appeal and requested an injunction pending resolution of their appeal to preserve the status quo.

28

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) to review the denial of a preliminary injunction.

## II.

As a preliminary matter, the Board defendants present two reasons why the district court could not hear plaintiffs' claims. First, they argue that plaintiffs are collaterally estopped from making their Equal Protection Clause argument in light of the North Carolina state court decision. Second, they argue that the voter plaintiffs do not have standing to seek relief. For the reasons discussed herein, they are mistaken.

## A.

Collateral estoppel does not bar plaintiffs from raising their Equal Protection Clause claim in federal court. We look to the preclusion law of North Carolina to make this determination because "the Full Faith and Credit Act requires that federal courts give the state-court judgment . . . the same preclusive effect it would have had in another court of the same State." *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 525 (1986). In North Carolina, under the doctrine of collateral estoppel, "the determination of an issue in a prior judicial or administrative proceeding precludes the relitigation of that issue in a later action, provided the party against whom the estoppel is asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding." *Whitacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 880 (N.C. 2004). Defendants must establish that all requirements are satisfied. *Thomas M. McInnis & Assocs. v. Hall*, 349 S.E.2d 552, 557 (N.C. 1986).

In the instant case, the Board is attempting to collaterally estop the voter plaintiffs from arguing that its rule changes and the state court consent decree violate their rights to

29

vote under the Equal Protection Clause. Those voters were not party to the state court litigation, so the Board must show that the voter plaintiffs in the instant case "[a]re in privity with parties" to the state court case—that is, the legislative leaders. *Id.*

In its broad contours, "'privity' for purposes of . . . collateral estoppel 'denotes a mutual or successive relationship to the same rights of property.'" *Hales v. N.C. Ins. Guar. Ass'n*, 445 S.E.2d 590, 594 (N.C. 1994) (quoting *Settle ex rel. Sullivan v. Beasley*, 308 S.E.2d 288, 290 (N.C. 1983)). The North Carolina Supreme Court has said that "interest[] in the same question" is not sufficient to establish privity. *State ex rel. Tucker v. Frinzi*, 474 S.E.2d 127, 130 (N.C. 1996) (quoting 47 Am. Jur. 2d *Judgments* § 663 (1995)). The defendants point to no shared property rights between the legislative leaders and the voter plaintiffs and offer only out-of-state precedent for the proposition that these parties' relationship is one that can give rise to privity. Since the general rule in American law is one of nonparty preclusion in only "limited circumstances," *Taylor v. Sturgell*, 553 U.S. 880, 898 (2008), we decline to so extend North Carolina privity law and find that the voter plaintiffs are not collaterally estopped from bringing their Equal Protection Clause claim.

We also agree with Judge Osteen's conclusion that the legislative plaintiffs are not collaterally estopped from bringing their Elections Clause claim, and we reject defendants' arguments to the contrary. As the Supreme Court explained in *Arizona v. California*, 530 U.S. 392, 414 (2000), the general American rule is that "consent judgments ordinarily support claim preclusion but not issue preclusion." *Id.* (quoting 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4443, pp. 384-85 (1981)). Although the consent decree discusses the release of claims *against* the Board,

30

it evinces no intent to preclude the legislative leaders from litigating their Election Clause claim in subsequent litigation. And the legislative leaders never consented to or signed the consent decree. *See Nash Cty. Bd. of Editors v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981) (under North Carolina law a "lack of actual consent" negates preclusion). And even if the consent decree *could* have preclusive effect, our review of the record suggests that the legislative plaintiffs did not have "a full and fair opportunity to litigate that issue in the earlier proceeding," *Whitacre P'ship*, 591 S.E.2d at 880. The state court addressed the legislative leaders' Election Clause argument in a single conclusory sentence without any analysis. Under North Carolina preclusion law, plaintiffs are not barred from relitigating the important Elections Clause issues they raise in this case.

## B.

Article III of the U.S. Constitution limits federal courts to resolving "cases and controversies," of which "[t]he doctrine of standing is an integral component." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). As the parties invoking federal jurisdiction, plaintiffs "bear[] the burden of establishing standing." *Id.* To do so, they must show that their injury is (1) "actual[,] . . . not conjectural or hypothetical, (2) . . . traceable to the challenged conduct[,] and (3)" redressable by a favorable court order. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). We first address the legislative leaders' standing to bring the Elections Clause claim and then turn to the voters' standing to bring the Equal Protection Clause claim.

The Speaker and the President Pro Tempore have standing to bring a challenge under the Elections Clause. Under North Carolina law, the Speaker and the President Pro

31

Tempore jointly represent the interests of the General Assembly of North Carolina and can pursue those interests in court. *See* N.C. Gen. Stat. § 1-72.2. Although the General Assembly did not authorize this particular suit, that is just one possible indicium of institutional injury, not a requirement. It is sufficient that the General Assembly authorized them to represent their interests in court. And, unlike *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), in which a closely-divided Court did not find standing, the legislative leaders in this case represent both houses and are asserting an interest of the legislature *qua* legislature, not one of the state. Thus, this case is more analogous to *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015), in which the Court did finding legislative standing.

In analyzing legislative standing, the Supreme Court has applied the same framework from *Lujan* that governs general standing analysis. *See Ariz. State Legislature*, 576 U.S. at 799–800. The legislative leaders maintain that the General Assembly has been injured by the Board usurping their authority under the Elections Clause to set "[t]he Times, Places and Manner of holding Elections" because the Board's rule changes contravene the recently enacted election statute. Like the Arizona Legislature with its redistricting plan, the North Carolina General Assembly claims its election timeline and witness requirement have been "completely nullified" by impermissible executive action. *Id.* at 803 (quoting *Raines v. Byrd*, 521 U.S. 811, 823 (1997)). This is a sufficiently concrete infringement on the General Assembly's constitutional prerogatives to proceed to the merits. And the traceability and redressability prongs are also met because an injunction against the implementation of the Numbered Memoranda would return the electoral procedures to the

32

status quo, which the legislative leaders believe is consistent with the statute they enacted and thus redresses their Elections Clause grievance.

The voters have standing to bring an Equal Protection Clause claim. They argue that the Board's allowance of ballots without a witness and ballots received after the statutory deadline arbitrarily and disparately treats them differently from other voters in violation of the Equal Protection Clause. *See Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Since the Board's procedural changes directly caused this alleged harm and an injunction would return the electoral procedures to the status quo, the traceability and redressability prongs of standing have been satisfied. For much the same reasons as the district court, we find that the plaintiffs have demonstrated an actual injury they will suffer if they are correct on the merits. Since some voter plaintiffs have already cast their absentee ballots, the effective elimination of the witness requirement and the extension of the ballot receipt deadline would create requirements for later voters that differed from those to which the plaintiffs were subject. [3]

Therefore, we find that the voter plaintiffs have adequately pleaded facts to support their standing to bring this case.

### III.

To merit an injunction pending appeal, plaintiffs must show they are likely to succeed on the merits of their appeal, that they will be irreparably injured absent an injunction, that the equitable balance favors an injunction, and that an injunction benefits

---

[3] The voter plaintiffs also allege a harm stemming from vote dilution. Because a single basis is sufficient to establish standing, we do not assess this argument.

33

the public. *See John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017); *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016). We conclude that all four factors favor plaintiffs, and we therefore would issue the injunction pending appeal.

Ordinarily, we would hesitate to issue an injunction pending appeal. But two special factors are present in this case. First, our disagreement with the district court is very narrow. We agree with the district court's conclusion that plaintiffs are likely to succeed on the merits of their claims and that they will be irreparably injured absent a preliminary injunction. However, the district court reasoned that the *Purcell* principle, which bars courts from changing balloting rules shortly before federal elections, required denying a preliminary injunction "even in the face of what appear to be clear violations." *Moore* Appellant App. at 158. We believe that *Purcell* requires the opposite result, and that it operates to bar the Board from changing the rules at the last minute through a state-court consent decree.

Second, an injunction pending appeal is necessary to preserve the status quo, properly understood. Exercising its constitutional power under the Elections Clause of the U.S. Constitution, the General Assembly set rules for the upcoming election in response to the COVID-19 pandemic. By changing those rules during an ongoing election, the Board changed the status quo. Only an injunction pending appeal can "alleviate that ongoing harm." *John Doe Co.*, 849 F.3d at 1137 (Kavanaugh, J., dissenting). Allowing the Board's changes to go into effect now, only two weeks before the election and after half a million North Carolinians have voted, will cause chaos that equity cannot tolerate.

34

A.

First, we agree with the district court that plaintiffs are likely to succeed on the merits of their appeal. The Board has commandeered the North Carolina General Assembly's constitutional prerogative to set the rules for the upcoming federal elections within the state. The Constitution explicitly grants the power to set the rules for federal elections to the General Assembly. The Elections Clause states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed *in each State by the Legislature thereof*; but Congress may at any time by Law make or alter such Regulations." U.S. Const. art. 1, § 4, cl. 1 (emphasis added). The Electors Clause states that "[e]ach State shall appoint, in such Manner *as the Legislature thereof may direct*," electors for President and Vice President. U.S. Const. art. II, § 1, cl. 2 (emphasis added); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892) (explaining that this clause "convey[s] the broadest power of determination" and "leaves it to the legislature exclusively to define the method" of appointing presidential electors).

Unlike many parts of the Constitution, these clauses speak in clear, direct language. The power to regulate the rules of federal elections is given to a specific entity within each State: the "Legislature thereof." The word "legislature" was "not of uncertain meaning when incorporated into the Constitution." *Smiley v. Holm*, 285 U.S. 355, 365 (1932); *Hawke v. Smith*, 253 U.S. 221, 227 (1920). In North Carolina, the legislative power is given solely to the General Assembly. N.C. Const. art. II, § 1 ("The legislative power of the States shall be vested in the General Assembly . . . .").

35

But these clauses also embody the brilliance of other constitutional provisions: they establish a check on the power of the state legislature. That power is given to one institution: the United States Congress. This power is not given to the state courts, and it is not given to the states' executive branches. *See, e.g.*, The Federalist No. 59 (Alexander Hamilton) (discussing division of power between the state legislatures and Congress to make federal election rules but mentioning no other branches of government). The Founders knew how to distinguish between state legislatures and the State governments as a whole. They did so repeatedly throughout the Constitution. *See, e.g.*, U.S. Const. art. 1, § 2 (distinguishing between "State" and "State Legislature"). Therefore, the only plausible inference from the constitutional text is that the term "legislature" unambiguously excludes the power to regulate federal elections from state courts and executive-branch officials.[4]

Defendants argue that this is just a state-law case, and that the federal courts have no business acting upon it. We agree with defendants that federalism and a robust respect for the substantial authority of the state courts are essential to our constitutional order.

---

[4] In *Arizona State Legislature*, the Court found that the legislative power of a State to draw congressional district lines could be shared with other branches of state government. 576 U.S. at 808–09 ("[O]ur precedent teaches us that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking, which may include the referendum and the Governor's veto."). That case does not control this one because the Arizona Constitution changed the state's "lawmaking process" to empower an entity in addition to the state legislature: the people acting through referendum. *Id.* at 817–18. The Court's analysis was also limited to the Elections Clause, which was relevant to crafting congressional districts, and not the Electors Clause. Even if *Arizona State Legislature* stands for the proposition that North Carolina *could* empower the Board to change the election rules in federal presidential and legislative races consistent with the Elections Clause and the Electors Clause, it is apparent that state law does not authorize what the Board did in this case, as Judge Osteen concluded below.

36

When the federal Constitution was ratified, the States retained sovereign powers, including the general police power to pass legislation. When a state exercises the police power to pass legislation, it is subject to the limits of its own constitution. And the responsibility of determining the meaning of a state's legislation belongs primarily to that state's judiciary. Federal courts must take great care not to intrude on that power. *See, e.g.*, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

But those weighty principles do not control in this case. The federal Constitution did a bit more than just recognize the States' preexisting police powers. It also granted state legislatures a new power they did not possess before ratification: the power to set the rules for federal elections. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 803 (1995). Because federal elections "arise from the Constitution itself," any "state authority to regulate election to those offices . . . had to be delegated to, rather than reserved by, the States." *Cook v. Gralike*, 531 U.S. 510, 522 (2001). When the state legislatures exercise this power, they are exercising a federal constitutional power that cannot be usurped by other branches of state government. *See Arizona State Legislature*, 576 U.S. at 807–08 (distinguishing between state legislative powers "derived from the people of the State" and those with a "source in the Federal Constitution" (quoting *Hawke*, 253 U.S. at 229–30)).

Thus, a "significant departure from the [State's] legislative scheme for appointing Presidential electors" or for electing members of the federal Congress "presents a federal constitutional question" we must answer. *Bush v. Gore*, 431 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *see also Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304 (1816) (concluding Virginia court misinterpreted state law in order to reach a federal

37

question); Richard H. Fallon, Jr., et al., *Hart & Wechsler's The Federal Courts and the Federal System* 487–88 (7th ed. 2015) (discussing how federal courts can answer antecedent state-law questions to reach federal legal questions). Although we hesitate to opine on state law, the constitutional delegation of power to the state legislature means that "the text of [state] election law itself, and not just its interpretation by the courts of the States, takes on independent significance." *Bush*, 431 U.S. at 112–13 (Rehnquist, C.J., concurring). This obligates us to analyze state law to determine if the federal Constitution was violated. The integrity of federal elections is not a simple state-law matter.

In the present case, the Board does not even try to argue that the consent decree is consistent with the Bipartisan Elections Act of 2020. Instead, the Board argues that it had authority to change the election rules under N.C. Gen. Stat. § 163-27.1, which gives it authority to "exercise emergency powers to conduct an election in a district where the normal schedule is disrupted by" a "natural disaster," "extremely inclement weather," or "an armed conflict."

We agree with the district court that the Board's claim of statutory authority for its actions is meritless. Although the COVID-19 pandemic is a traumatic event for the country, it is not the type of "natural disaster" referred to by the statute. The statute envisions a *sudden* disaster "where the normal schedule for the election is disrupted" and the General Assembly does not have time to respond to it before a scheduled election. This limitation on the statute is reinforced by the fact that it grants the Board power to make changes only "in a district" where disruption occurs, suggesting the power is far more limited than the Board suggests. A good example of a disaster that would qualify is if a hurricane devastated

38

part of the State a couple of days before the election. Here, in contrast, the pandemic has been ongoing for months and the General Assembly convened to adopt a bill specifically intended to account for the conditions created by COVID-19. The Board cannot characterize COVID-19 as a sudden disaster "where the normal schedule for the election is disrupted."

Further, the statute envisions only minor departures from the General Assembly's election rules. The provision relied upon by the Board states that the Board "shall avoid unnecessary conflict" with other provisions of the State's election rules. N.C. Gen. Stat. § 163-27.1. Ignoring that language, the Board adopted major changes to the election law that clearly clash with the General Assembly's intent. Rarely will legislative intent be as straightforward as it is in this case. Just a few months ago, an overwhelming bipartisan majority of the General Assembly passed, and Governor Cooper signed, a bill setting the rules for the upcoming election in light of the COVID-19 pandemic. Bipartisan Elections Act of 2020, 2020 N.C. Sess. Laws § 2020-17. Although the General Assembly substantially expanded mail-in voting and made it easier, it also retained important limitations on that voting to combat potential voter fraud, a fight which "the State indisputably has a compelling interest" in winning. *Purcell*, 549 U.S. at 4 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)). For example, the General Assembly shifted from requiring absentee voters to secure *two* witnesses to requiring only one witness. Although that move expresses a desire to facilitate absentee voting, it also expresses a firm desire to retain a witness requirement. The Board produced an "unnecessary conflict" with state law in violation of N.C. Gen. Stat. § 163-27 by discarding

39

the witness requirement in favor of a process in which voters could self-certify their ballots. And the fact that the General Assembly maintained its deadline for the receipt of absentee ballots, even as other states were significantly extending them, evinces an intent not to allow absentee votes to be received well after the election. That the Board agreed to a receipt day far later than the General Assembly enacted produced another "unnecessary conflict" with state law in violation of N.C. Gen Stat. § 163-27.[5]

In light of such clear legislative intent, we cannot identify a significant rationale for the Board's decision to jettison the General Assembly's election rules in a lawsuit. As is unfortunately happening in just about every state where competitive elections are occurring, a series of lawsuits were brought to challenge the state legislature's choices. But considering the Supreme Court's well-established rule that courts should not change the rules of federal elections shortly before they begin, and the long list of cases upholding witness requirements and absentee ballot deadlines, these lawsuits had little chance of success. Indeed, a federal judge upheld the rules that the Board voided just two months ago. But a practically identical challenge was then brought in state court, and the Board showed little or no interest in defending the General Assembly's rules even after an initial federal-court victory. The Board agreed to a consent decree that bargained away important

---

[5] We also agree with Judge Osteen that the Board was not authorized to adopt these rule changes under N.C. Gen. Stat. § 163-22(a), which allows the Board to adopt rules and regulations for elections "so long as they do not conflict with any provisions" of the General Assembly's election rules. As discussed, the Board's changes in this case flatly contradict the rules set by the General Assembly. We also concur with Judge Osteen's conclusion that the Board did not have authority to change the election rules under N.C. Gen. Stat. § 163-22.2.

40

safeguards designed to protect the integrity of mail-in balloting. And Judge Osteen found that the Board negotiated this deal secretly and without consulting the legislative leaders, and it continued to advocate for the consent decree even though the leaders of the General Assembly intervened and vigorously objected to it. We therefore cannot conclude that the Board's actions constituted a good faith effort to implement the General Assembly's election law.

Finally, the Board's actions appear to violate the North Carolina Constitution, which establishes that the General Assembly is the "Legislature" and exercises all legislative power under state law. N.C. Const. art. II, § 1 ("The legislative power of the States shall be vested in the General Assembly . . . ."). And the North Carolina Supreme Court has established a nondelegation doctrine limiting the ability of the General Assembly to delegate legislative power to an executive agency. *Adams v. N.C. Dep't of Nat. & Econ. Res.*, 249 S.E.2d 402, 410 (N.C. 1978) ("[T]he legislature may not abdicate its power to make laws or delegate its supreme legislative power to any coordinate branch or to any agency which it may create."). Permissible delegations are limited to situations featuring "complex conditions involving numerous details with which the Legislature cannot deal directly." *N.C. Turnpike Auth. v. Pine Island, Inc.*, 143 S.E.2d 319, 323 (N.C. 1965). This makes the Board's broad interpretation of its emergency powers under N.C. Gen. Stat. § 163-27.1 even more implausible, as it would transform the provision from a clearly acceptable narrow delegation into a dubiously broad delegation.

We do not question the ability of the Board, or other state election boards, to make minor *ad hoc* changes to election rules in response to sudden emergencies. There is a long

41

history, both in North Carolina and in other states, of this power being exercised, and we understand that this power is important to the smooth functioning of elections. For example, if an electrical power outage halts voting in a precinct, we are confident that the Board could legally extend voting in that precinct.

But here the state legislature's constitutional power is at stake. If we refuse to defend the prerogative of the General Assembly to create election rules in a case as clear as this one, the power of the state legislatures under the Elections Clause and the Electors Clause will be at the mercy of other state-government actors. If non-representative state officials can disregard a clear mandate from the state legislature merely by *claiming* state-law authority, and if federal courts cannot review that claim, non-representative state officials will be able to strip the state legislatures of their federal constitutional power whenever they disagree with legislative priorities. The power of the people's representatives over elections will be jeopardized. That cannot be, and the Constitution does not allow it.

We also agree with the conclusion of both Judge Osteen and Judge Dever that plaintiffs have a good chance of vindicating their Equal Protection Clause claims on appeal. As noted, the Board changed the rules after voters had cast over 150,000 ballots in North Carolina. Plaintiffs' Equal Protection Clause claims thus raise serious questions about the scope of the Supreme Court's one-person, one-vote principle, and the attendant limitations on the ability of state officials to apply different rules to different voters in the same election. *See Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) ("'[V]oters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962))); *Reynolds v. Sims*, 377

42

U.S. 533, 555 (1964). By intentionally allowing votes to be cast that violate the Bipartisan Elections Act of 2020, defendants created serious questions under the Equal Protection Clause that should be considered on appeal. *Anderson v. United States*, 417 U.S. 211, 226 (1974) ("The right to an honest [vote count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." (internal quotation marks and citation omitted)). Because the Supreme Court has explained that the Equal Protection Clause protects against "the diluting effect of illegal ballots," *Gray v. Sanders*, 372 U.S. 368, 380 (1963), plaintiffs are likely to succeed on their appeal of this claim.

B.

Second, the plaintiffs will suffer irreparable injury absent an injunction pending appeal. The state legislative leaders will suffer irreparable injury if their carefully crafted legislation for the upcoming election is upset. Enjoining a "State from conducting [its] elections pursuant to a statute enacted by the Legislature . . . seriously and irreparably harm[s] [the State]." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). As Chief Justice Roberts has explained, the inability to "employ a duly enacted statute" is an irreparable harm. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). This irreparable harm is especially poignant in the present case because the General Assembly adopted election rules *specifically for this election*, and allowing them to be disregarded until after the election renders their legislative action completely pointless. As to the Equal

43

Protection Clause claim, the injury the voter plaintiffs allege will necessarily come to pass in the absence of an injunction, thus causing irreparable injury.

C.

Finally, we conclude that the balance of the equities and the public interest favor plaintiffs. Endless suits have been brought to change the election rules set by state legislatures. *See* Stanford-MIT Healthy Elections Project, *COVID-Related Election Litigation Tracker* (last visited Oct. 19, 2020) (documenting 385 lawsuits filed against election rules this year), https://healthyelections-case-tracker.stanford.edu/. This pervasive jockeying threatens to undermine public confidence in our elections. And the constant court battles make a mockery of the Constitution's explicit delegation of this power to the state legislatures.

The Supreme Court has repeatedly made clear that courts should not change the rules of a federal election in the "weeks before an election." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *see also Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). The district court denied injunctive relief solely on the basis of *Purcell*. We commend the district court for its good-faith effort to comply with *Purcell* in a year where courts are too often meddling in elections. However, we conclude the district court misunderstood how *Purcell* applies to this case. As the district court observed, *Purcell* has traditionally been applied against federal courts changing the rules shortly before elections. But there is no principled reason why this rule should not apply against interferences by state courts and agencies. The victim of a last-minute interference, whatever its source, is the same: a federal election. It is a difficult enough task

44

to conduct an election in the middle of a pandemic without proliferating lawsuits and constantly changing rules. Attempts to change election rules, whether facilitated in federal or state court, cause the "judicially-created confusion" that the *Purcell* principle is designed to guard against. *See Republican Nat'l Comm.*, 140 S. Ct. at 1207. Whenever interference occurs, it incentivizes an avalanche of partisan and destabilizing litigation against election rules duly enacted by state legislatures. If *Purcell* did not apply in state courts, federal election rules would continue to be at the mercy of litigation and rushed, last-minute decisions by state judges in contravention of the delegation of authority by the Constitution under the Elections Clause.

Therefore, we conclude that *Purcell* requires granting an injunction pending appeal in this case. The status quo, properly understood, is an election run under the General Assembly's rules—the very rules that have been governing this election since it began in September. The Board and the North Carolina Superior Court for the County of Wake impermissibly departed from that status quo approving changes to the election rules in a consent decree in the middle of an election. Over 150,000 ballots had already been received when the Board changed the rules, and its actions have draped a shroud of uncertainty upon North Carolina's elections. Now that over half a million votes have been cast, allowing the Board's changes to go into effect would cause even greater turbulence. *Purcell* counsels in favor of ending this uncertainty by issuing injunctive relief pending appeal.

The General Assembly established rules for orderly elections amidst a pandemic. A wave of last-minute litigation in federal and state courts has resulted in North Carolina's rules changing repeatedly within a few weeks. This is happening as hundreds of thousands

45

of North Carolinians have already voted in important elections. This chaos must end. Because only an injunction pending appeal restores order, we would issue it.

* * *

This phenomenon is hardly unique to North Carolina. Around the country, courts are changing the rules of the upcoming elections at the last minute. It makes the promise of the Constitution's Elections and Electors Clauses into a farce. It disrespects the Supreme Court's repeated and clear command not to interfere so late in the day. This pernicious pattern is making the courts appear partisan, destabilizing federal elections, and undermining the power of the people to choose representatives to set election rules. By not issuing the injunction pending appeal we propose in Part IV, this court has missed an opportunity to stand athwart this destructive trend.

IV.

Our proposed injunction pending appeal would read as follows:

Upon consideration of submissions relevant to appellants' emergency motions for injunctions pending appeal, we hereby grant the motions. The North Carolina Board of Elections is enjoined from eliminating the North Carolina General Assembly's requirement that absentee and mail-in ballots include a witness signature. *See* Elections Act of 2020, 2020 N.C. Sess. Laws § 2020-17. The North Carolina. Board of Elections is also enjoined from extending the deadline for the receipt of absentee and mail-in ballots beyond that established by the North Carolina General Assembly in N.C. Gen. Stat. § 163.231(b)(2)b. Under the General Assembly's law, such absentee and

46

mail-in ballots must be mailed and postmarked on or before Election Day, and they must be received within "three days after the election by 5:00 p.m." This order will remain in effect until these cases are finally decided on the merits, or until further notice by this Court.

47

NIEMEYER, Circuit Judge, dissenting:

I am pleased to join the dissenting opinion written by the panel majority. This case was originally assigned to a panel, but the work of the panel was hastily preempted by an en banc vote requested by the panel's dissenter after the panel majority had shared its views but before those views could be published.

To be sure, an en banc hearing may be requested at anytime. But the traditional practice of this court is for the assigned panel to hear a case and publish its opinion before the court considers whether to rehear the case en banc. Once in a rare while, the court has elected instead to hear a case en banc before consideration by a panel on the ground that the extraordinary importance of the matter justifies the participation of the entire court. But here, neither course was followed. The panel considered the case assigned to it and promptly exchanged votes on the outcome. Finding that he had been outvoted, the dissenting judge immediately initiated an en banc vote before the panel could even circulate its views to the entire court, let alone to the public. This departure from our traditional process strikes me as needlessly divisive — even considering the matter's time sensitive nature. I am saddened to see it, especially on a court that has taken such pride in its collegiality.

On the merits, the en banc action appears to be just as aggressive. After a substantial number of North Carolina voters — well over 1,000,000 as of October 17, 2020 — have voted and only two weeks before election day, the en banc majority now acts to permit changes to balloting rules. Such action by the en banc majority, as the panel majority has

48

explained, flies in the face of the principle that balloting rules for federal elections must not be changed shortly before elections — indeed, in this case, *during* an election.

I dissent from the preemptive en banc action in this case, and for the reasons given by the panel majority, I vote to grant the requested injunction against implementation of last minute ballot rules changes.

49